**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| A. MARK GETACHEW and<br>DENORA M. GETACHEW<br><br>      Plaintiffs,<br><br>v.<br><br>L&S INVESTMENTS, LLC.,<br>LAWRENCE R. RUTOWSKI, and<br>ERIC GRAYSON<br><br>      Defendants. | No. 3:23-cv-01381-MPS |

**<u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>**

**I.    Introduction**

Plaintiffs Mark and DeNora Getachew ("the Getachews") bring this action against L&S Investments, LLC ("L&S"), Lawrence Rutkowski ("Rutkowski," and together with L&S, "the L&S Defendants"), and Attorney Eric Grayson ("Attorney Grayson" or "Grayson"). The Getachews allege an abuse of process claim against all defendants arising out of state court litigation concerning the parties' bitter landlord-tenant dispute. The L&S Defendants and Grayson have each filed a motion for summary judgment. For the reasons set forth below, the motions are denied.

**II.    Factual and Procedural History**

**A.  Factual Background**

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits and are undisputed unless otherwise indicated. I discuss only those facts necessary to decide the defendants' motions.

1

### i. The Lease of the Property

In 2006, Rutkowski bought a "beautiful" home in Greenwich, Connecticut ("the Property"), where he lived with his family for about ten years. ECF No. 182-30 ¶ 2. In 2012, Rutkowski conveyed the Property to a trust for which his sister was the trustee (the "Trust"). *Id.* ¶ 3. In 2013, Rutkowski and his wife created L&S, a Connecticut limited liability real estate investment and management company. *Id.* ¶ 4. At all relevant times, Mr. Rutkowski was the managing member of L&S. *Id.* ¶ 5.

When the COVID-19 pandemic began in March 2020, the Getachews, both attorneys, were living in New York City with their children. *Id.* ¶¶ 6, 7. The Getachews wanted to leave New York City due to the pandemic and expressed interest in leasing the Property. *Id.* ¶ 7. The Getachews toured the Property with Jen Danzi ("Danzi"), a realtor hired by Rutkowski. ECF No. 182-31 ¶ 6. The Getachews and L&S, through their respective realtors, negotiated the terms of a lease for the Property. *Id.* ¶ 7. The Getachews entered into a two-year lease agreement with L&S, as the authorized representative of the Trust (and owner of the Property), under which the Getachews agreed to pay a monthly rent of $11,000. ECF No. 182-30 ¶ 8. Rutowski signed the lease as the managing member of L&S. *Id.* ¶ 9. Rutkowski sent Attorney Grayson a copy of the signed lease and asked Grayson to draft a rider to the lease. ECF No. 182-31 ¶ 8. Attorney Grayson negotiated the rider with Mr. Getachew and drafted various iterations of it. *Id.* ¶ 9. The lease and rider were fully executed on or about June 5, 2020. *Id.* ¶ 10. The Getachews paid the security deposit and the June 2020 prorated rent prior to moving into the Property. *Id.*

Almost immediately after the Getachews took possession of the Property, the working relationship between the Getachews and Rutkowski became strained due to disagreements regarding conditions at the Property. ECF No. 182-30 ¶ 10. The Getachews contend, and defendants dispute, that the parties had agreed to a setoff arrangement wherein the Getachews

would deduct from their rent the cost of repairs they incurred. *Id.* The Getachews engaged a contractor to perform repairs to the pool, among other repairs to the Property, ECF No. 182-31 ¶ 11, and did not pay rent for July and August 2020 because the cost of the repairs exceeded the rent for those months. *Id.* ¶ 12; ECF No. 182-30 ¶ 10. Rutkowski took the position that the Getachews were misusing Connecticut's eviction moratorium to avoid paying rent and that they made unauthorized alterations to the house and the pool. ECF No. 182-31 ¶ 13.

### ii.  The First Affidavit

The Getachews filed a complaint for breach of the lease against the L&S Defendants in the Connecticut Superior Court, Civ. No. FST-CV20-6052318-S (the "State Court Action"). ECF No. 182-30 ¶ 11. The Getachews later amended their complaint to assert additional claims. *Id.* Attorney Grayson, who is admitted to practice law in Connecticut, appeared on behalf of the L&S Defendants in the State Court Action. *Id.* ¶ 12. Attorney Grayson had worked as Rutkowski's attorney on various matters for approximately ten years. *Id.* Through Attorney Grayson, the L&S Defendants filed counterclaims against the Getachews, including for their failure to pay rent. *Id.* ¶ 13.

In the State Court Action, the Getachews were represented by Attorney Alison Baker ("Attorney Baker").  *Id.* ¶ 14. Shortly after the Getachews initiated the State Court Action, Attorney Grayson spoke by phone with Attorney Baker. *Id.* During this phone call, Attorney Baker informed Attorney Grayson that if he filed an appearance on behalf of Rutkowski and L&S, the Getachews might move to disqualify Attorney Grayson because they believed that he was a necessary fact witness to the issues in dispute in the State Court Action. ECF No. 182-31 ¶ 16. The parties dispute whether Rutkowski knew about this conversation in or around the time it occurred. ECF No. 182-30 ¶ 14.

After the phone call between Attorneys Grayson and Baker, Attorney Baker emailed Attorney Grayson: "[A]s I said to you when you called me on Saturday morning, it is also improper to threaten to provide defamatory statements to the press, as you did, to extract an agreement to not file a disqualification (or any other) motion, or to otherwise pursue or not pursue any action with respect to the lawsuit we recently commenced." ECF No. 182-31 ¶ 18. The Getachews contend this email is evidence that in the phone call with Attorney Baker, Grayson threatened to go to the New York Post about the Getachews if they persisted in their stated intention to disqualify him as Rutkowski's counsel. GAMF [1] ¶ 1. Attorney Grayson sent a reply: "Your email is rejected. My only comment about the press was if they contacted me, I would tell the truth about your client." ECF No. 182-31 ¶ 19. Rutkowski was not copied on these emails, and the parties dispute whether he saw them or was otherwise aware of Attorney Grayson's alleged threat to Attorney Baker. *Id.* ¶ 20; ECF No. 182-30 ¶ 15. Grayson denied the threat at his deposition. GAMF ¶ 3.

Attorney Grayson filed an appearance in the State Court Action on behalf of Rutkowski and L&S, and the Getachews filed a motion to disqualify Grayson as counsel. ECF No. 182-31 ¶¶ 21, 22. In support of the L&S Defendants' opposition to the motion to disqualify, Attorney Grayson prepared a two-page affidavit consisting of five paragraphs for Rutkowski to sign. *Id.* ¶ 24. Attorney Grayson also prepared his own affidavit in support of the opposition to the motion to disqualify. *Id.* ¶ 25. Rutkowski did not sign the first version of the affidavit that Grayson drafted for him and, over the next few days, Rutkowski requested multiple additions and edits. *Id.* ¶ 26. Rutkowski testified that the initial draft "did not present the judge . . . [with] a fulsome picture and

---

[1] In accordance with Local Rule 56, the Getachews' 56(a)(2) Statements each contain a separate section entitled "Additional Material Facts." ECF Nos. 182-30 at 16; 182-31 at 25. Because the Getachews' Additional Material Facts are numbered 1–47 (and therefore share paragraph numbers with each of the reproduced 56(a)(1) statements and the Getachews' response to each paragraph), and are identical between ECF Nos. 182-30 and 182-31, the Court will refer to the Getachews' Additional Material Facts as "GAMF."

therefore it needed to be strengthened because at this point I'm very upset with the tenants that have been antagonistic and argumentative from the day they moved in and I felt that the judge should be aware of that." *Id.* ¶ 27. Rutkowski testified that he was comfortable with the tone of his affidavit and believed the statements contained therein to be factually correct. *Id.* ¶ 29. Attorney Grayson advised Rutkowski that it was "appropriate" to include such facts and opinions in the affidavit. ECF No. 182-30 ¶ 20. Rutkowski signed under oath and notarized the final version of his affidavit. ECF No. 182-31 ¶ 30. On October 12, 2020, Attorney Grayson filed the L&S Defendants' brief in opposition to the motion to disqualify along with the affidavits executed by Rutkowski, Grayson, and Danzi. *Id.* ¶ 31; ECF No. 182-30 ¶ 17.

In Rutkowski's October 12, 2020 affidavit ("First Affidavit"), ECF No. 182-3, he made the following statements:

> Before I address the substance of the Motion to Disqualify, I want the Court to know that the Plaintiffs, especially Attorney Mark Getachew, are the singularly least professional, least honest (read dishonest), least moral people I have dealt with in my 40 plus years of professional life. . . The Getachews are the worst type of tenants one can imagine. While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the Covid epidemic, and have taken advantage of the no-eviction moratorium in NY enacted by Governor Cuomo and now here, the moratorium in Connecticut enacted by Governor Lamont. . . this is clearly a tactical move by Attorney Getachew who I find, and given my experience in dealing with corporate America, to be of the lowest ethical and professional standards I have ever encountered.

*Id.* ¶¶ 2, 3, 13.

### iii.  The New York Post Article

On October 15, 2020, after the State Court held a hearing on the motion to disqualify, Attorney Grayson sent Rutkowski an email at 5:00 pm identifying Julia Marsh, a reporter from the New York Post ("Post"), as the reporter who might try to contact him. ECF Nos. 182-30 ¶¶ 21,

22; 182-29 at 2.  Six minutes later, at 5:06pm, Rutkowski texted Attorney Grayson "let's wait for Judge ruling." ECF No. 182-21 at 4.

On October 20, 2020, the court denied the Getachews' motion to disqualify Attorney Grayson. ECF No. 182-30 ¶ 23. That same day, Attorney Grayson reached out to Post reporter Julia Marsh. *Id.* ¶ 24. Julia Marsh connected Attorney Grayson with Priscilla DeGregory ("DeGregory"), another reporter with the Post. *Id.* ¶ 25. DeGregory requested a link to the case docket, which Attorney Grayson provided by email. ECF No. 182-31 ¶ 43. DeGregory emailed Attorney Grayson saying that she planned to pitch an article about the State Court Action to her editor and requesting photos of the Property and confirmation of a picture of Mr. Getachew. *Id.* ¶ 44. Later that day, on October 20, Attorney Grayson forwarded his email thread with DeGregory to Rutkowski, asking if he had better photos of the Property. ECF No. 182-30 ¶ 26. Rutkowski claims he never saw or responded to the email, which the Getachews dispute. *Id.* ¶¶ 26, 28. Attorney Grayson also left Rutkowski a voicemail asking him to send photos of the Property, and Rutkowski emailed Attorney Grayson multiple photos of the Property later that day. *Id.* ¶¶ 28, 29.

The following day, on the morning of October 21, 2020, DeGregory emailed Attorney Grayson saying that she was "going forward with the story," *id.* ¶ 30, and Attorney Grayson requested that DeGregory include in the article a quote from him: "We will be filing a serious counterclaim shortly and moving for an eviction once the moratorium is lifted." ECF No. 182-31 ¶ 46. DeGregory again emailed Attorney Grayson and asked if Rutkowski could confirm a photo of Mr. Getachew. ECF No. 182-30 ¶ 31. Attorney Grayson forwarded the email to Rutkowski asking him to confirm, and responded to Ms. DeGregory that he was asking Rutkowski. *Id.* The parties dispute whether Rutkowski saw the email. *Id.*

The afternoon of October 21, 2020, the Post published the article, which was titled "Ex-Disney CFO claims couple squatting in his $2.2M Connecticut mansion." *Id.* ¶ 32. The article led with a photo of Mark Getachew and quoted from the First Affidavit, including Rutkowski's statements that the Getachews "are the singularly least professional, least honest …, least moral people I have dealt with in my 40 plus years of professional life"; "The Getachews are the worst type of tenants one can imagine"; and "While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the COVID epidemic, and have taken advantage of the no-eviction moratoriums[s]…" ECF No. 182-9 at 4. The parties dispute Rutkowski's role in, and knowledge leading up to, the publication of the article. ECF No. 182-30 ¶¶ 33, 34.

### iv. The Application for Prejudgment Remedy and the PJR Affidavit

In December 2020, the L&S Defendants filed an answer, special defense, and counterclaim in the State Court Action. ECF No. 182-31 ¶ 53. The counterclaim included a calculation for actual damages totaling $2,914,687. *Id.* ¶¶ 54, 55. The counterclaim also claimed treble and/or punitive damages in the amount of $8,744,061 under Connecticut statutes for statutory theft and unfair trade practices. *Id.* ¶¶ 54, 56. The L&S Defendants filed an application for prejudgment remedy ("PJR Application"), requesting that the State Court attach $8,744,061 of Plaintiffs' assets to secure satisfaction of a potential judgment on the L&S Defendants' counterclaims. ECF No. 182-30 ¶ 35. The defendants dispute who calculated the damages. *Compare id.* ¶ 37 ("Attorney Grayson calculated…") *with* ECF No. 182-31 ¶ 55 ("…Rutkowski's calculation…").

The PJR Application was supported by a December 10, 2020 affidavit sworn by Rutkowski ("PJR Affidavit"), in which he stated that the "Getachews are highly unethical individuals,

shysters, deadbeats and squatters… 'no rent' garbage made up by two dead beat shyster/squatters."
ECF No. 182-13 ¶¶ 7, 12.

On February 23, 2021, approximately eleven weeks after it was filed, the PJR Application
was withdrawn after the Getachews paid the outstanding rent. ECF No. 182-30 ¶ 38.

### v.  The Summary Judgment Affidavit

On January 3, 2022, the Getachews filed a motion for partial summary judgment in the
State Court Action, seeking judgment in their favor on some of the L&S Defendants'
counterclaims, special defense, and claims for treble and punitive damages. ECF Nos. 182-30 ¶
39; 182-31 ¶ 66. Attorney Grayson filed the L&S Defendants' opposition to the motion, along
with supporting affidavits executed by Rutkowski and Danzi. ECF No. 182-30 ¶ 40. Rutkowski
discussed the contents of his affidavit with Attorney Grayson, who said that the attestations therein
were "appropriate." *Id.* ¶ 41. Rutkowski's sworn March 14, 2022 affidavit ("Summary Judgment
Affidavit") contained many of the same statements in the First Affidavit, and added that the
Getachews are "nasty and devious people" using "Stalingrad Tactics." ECF No. 182-14 ¶¶ 5, 10.

Ultimately, the Getachews and the L&S Defendants agreed to submit their claims to
binding arbitration with a neutral third party, and the parties withdrew their claims in the State
Court Action. ECF No. 182-30 ¶¶ 43, 44. At no point in the State Court Action did the Getachews
file a motion to strike, seal, or for any other remedies with respect to the First Affidavit, the PJR
Application or Affidavit, or the Summary Judgment Affidavit. ECF No. 182-31 ¶ 74.

### B.  Procedural History

On October 20, 2023, the Getachews filed their complaint in this case. ECF No. 1. The
complaint asserts one cause of action against all defendants for abuse of process. *Id.* at 6. In support
of the abuse of process claim, the complaint alleges that the First Affidavit, PJR Application, PJR

Affidavit, and Summary Judgment Affidavit were submitted primarily "to disparage the Getachews and intimidate them into backing away from the [state court] litigation," to "pressure [the] Getachews into paying money that they did not owe" and "to gain collateral advantage extraneous to the merits of the underlying litigation." *Id.* at 10–15. The complaint alleged that the Getachews suffered professional reputational injuries and even death threats due to the defendants' conduct. *Id.* at 12–13.

The defendants filed motions to dismiss, ECF Nos. 24, 30, which Judge Hall denied on April 5, 2024. ECF No. 48. Judge Hall found that the Getachews' complaint contained sufficient factual allegations, accepted as true, to state a plausible abuse of process claim. *Id.* at 10–11.

Judge Hall rejected many of the defendants' arguments that they repeat in their motions for summary judgment. First, Judge Hall rejected the argument that the defendants' conduct was protected by the litigation privilege, which protects communications published in the course of litigation so long as they are pertinent to the subject of the controversy, because the litigation privilege does not apply to abuse of process claims. *Id.* at 7. Second, Judge Hall rejected the defendants' argument that the Getachews were effectively alleging defamation, which *is* subject to the litigation privilege, because the Getachews had sufficiently alleged their abuse of process claim. *Id.* at 8. Third, Judge Hall rejected the defendants' argument that absolute immunity applies to the Getachews' claim because it is "based on the words used in [the Affidavit]," finding that reading the allegations of the complaint together suggested "that the plaintiffs' claims regarding the Affidavit are based not solely on the words used therein, but on the allegedly improper purpose behind the Affidavit's submission." *Id.* at 8 n.1. Fourth, Judge Hall rejected the argument that the Getachews were seeking to hold the defendants liable for their opinions, finding that "the statements being opinions arguably bolsters plaintiffs' allegations that the Affidavit was primarily

submitted to publicize derogatory statements about the Getachews, given that such personal and incendiary opinions are undoubtedly inappropriate for an Affidavit submitted in response to a Motion to Disqualify." *Id.* at 10 n.4.

The defendants have moved for summary judgment. ECF Nos. 155, 164.

### III.    Legal Standard

Summary judgment will be granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). It is the movant's burden to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant meets its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Even then, summary judgment is only proper where "the record taken as whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). But "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.    Discussion

### A.  Plaintiffs Have Pointed to Disputes of Material Fact

Under Connecticut law, "to prevail on an abuse of process claim, the plaintiff must establish that the defendant used a judicial process for an improper purpose. Use of a judicial process for an improper purpose occurs when a party uses that process for something for which it was not designed. Such improper purpose must be the primary, rather than the incidental, reason the tortfeasor engages in the process in question." *Miles v. City of Hartford*, 445 F. App'x 379, 384 (2d Cir. 2011) (internal citations, quotation marks, and alterations omitted); *see also Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Invs., L.P.*, 260 Conn. 766, 772 (2002) ("the gravamen of the action for abuse of process is the use of a legal process . . . against another *primarily* to accomplish a purpose for which it is not designed"). I find that the Getachews have pointed to evidence that would permit a reasonable trier of fact to find in their favor on the abuse of process claim.

I discuss only enough evidence relating to the First Affidavit and the PJR Application to explain my reasoning. My explanation as to the First Affidavit and PJR Application should <u>not</u> be interpreted to indicate that other actions by the defendants do not constitute legal processes or that other evidence not discussed herein does not raise genuine issues of material fact. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) ("If, as to the issue on which summary judgment is sought, there is *any* evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.") (emphasis added).

11

### i.   A Factfinder Could Conclude That Defendants Used Legal Process

Connecticut courts take a broad view of the types of "legal process" that can support an abuse of process claim. *See Larobina v. McDonald*, 274 Conn. 394, 406–07 (2005) ("Our review of the case law from other jurisdictions reveals that most courts that have considered the issue have construed the term process broadly." [citing cases] "All of these courts agree, however, that, although the definition of process may be broad enough to cover a wide range of judicial procedures, to prevail on an abuse of process claim, the plaintiff must establish that the defendant used a *judicial process* for an *improper purpose.*").

The defendants are responsible for at least two actions that fit within *Larobina*'s broad conception of "process." The First Affidavit was legal process because it was filed in the State Court Action in support of, and as an exhibit to, a brief opposing the motion to disqualify Grayson. ECF Nos. 182-31 ¶¶ 26–28, 30–31 (Rutkowski testified that he included statements in First Affidavit to give judge "fulsome picture"; Rutkowski signed and notarized the affidavit under oath, which Grayson filed on the L&S Defendants' behalf in support of brief in opposition to motion to disqualify). The PJR Application was also legal process because it was filed in the State Court Action and because it seeks to enforce a judicial remedy. ECF No. 182-30 ¶ 35 ("On December 10, 2020, Attorney Grayson filed the L&S Defendants' Application for a Prejudgment Remedy of Attachment . . . in the State Court Action, requesting that the Superior Court attach $8,744,061 of Plaintiffs' assets to secure satisfaction of a potential judgment on the L&S Defendants' counterclaims. Undisputed.").

Defendant Grayson contends that an affidavit is not an act of legal process sufficient to support a claim of abuse of process because it is not a "compulsory process forcing the performance or forbearance of some prescribed act," ECF No. 164-1 at 16. But he fails to acknowledge the Connecticut Supreme Court's endorsement of a broad construction of "process"

in *Larobina*. This Court has adopted this broad view of process. *See Davis v. United States*, 2007 WL 9753132, at *4 (D. Conn. Feb. 27, 2007) (looking to Connecticut law to embrace a broad definition of process in Federal Tort Claims Act case and finding that "Defendant's suggestion that its conduct in the state court proceedings is the only conduct relevant to Plaintiff's abuse of process claim is incorrect . . . Defendant's conduct relating to Plaintiff's criminal investigation, along with its conduct during the superior court proceedings, is relevant to the abuse of process claim and helps to create a material issue of fact regarding Defendant's primary purpose.").

Further, none of the Connecticut cases Attorney Grayson cites hold that an affidavit, standing alone, is not "legal process" that could support an abuse of process claim. The Second Circuit case he cites concerned a "malicious abuse of process claim" under New York law, the elements of which explicitly require the legal process to "compel performance or forbearance." He cites no Connecticut Supreme Court or Appellate Court decision imposing a similar requirement. *Compare Manhattan Enterprise Group LLC v. Higgins,* 816 Fed. App'x. 512, 514 (2d Cir., 2020) ("Under New York law, 'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'"); *with Williams v. Bean,* 2017 WL 5179231, at *8 (D. Conn. Nov. 8, 2017) ("Under Connecticut law, '[a]n action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed.'").

### ii.  There are Disputes of Material Fact as to Defendants' Primary Purpose

I next consider whether the Getachews have carried their burden by pointing to evidence from which a reasonable factfinder could conclude that the defendants used the legal process

*primarily* for an improper purpose. *Fernandez-Bravo v. Town of Manchester*, 711 F. App'x 5, 9 (2d Cir. 2017) ("The improper purpose must be the primary purpose for the process effected upon a plaintiff, because 'the addition of primarily is meant to exclude liability when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant.'"). With respect to the First Affidavit and the PJR Application, I find that the Getachews have pointed to evidence that raises material disputes of fact as to the defendants' primary purpose in using those legal processes. I discuss these in turn, setting forth only enough of the evidence to explain my reasoning in denying the motions for summary judgment.

### *The First Affidavit*

The Getachews have pointed to evidence that, viewed as a whole and in the light most favorable to them, would permit a reasonable factfinder to conclude that the First Affidavit was filed primarily for an improper purpose rather than to oppose the motion to disqualify Attorney Grayson.

The parties do not dispute that after the Getachews initiated the State Court Action, Attorney Grayson spoke by phone with Attorney Baker, who informed Grayson that if he filed an appearance on behalf of Rutkowski and L&S, the Getachews might move to disqualify him because they believed that he was a necessary fact witness. ECF No. 182-30 ¶ 14. It is also undisputed that after the attorneys' phone call, Attorney Baker emailed Attorney Grayson: "[A]s I said to you when you called me on Saturday morning, it is also improper to threaten to provide defamatory statements to the press, as you did, to extract an agreement to not file a disqualification (or any other) motion, or to otherwise pursue or not pursue any action with respect to the lawsuit we recently commenced." ECF No. 182-31 ¶ 18. The Getachews contend, and I agree, that a

reasonable factfinder could interpret this email as evidence that Grayson threatened to tarnish the Getachews' reputations in the media if they persisted in their stated intention to file a motion to disqualify him as Rutkowski's counsel.

The Getachews point to ample evidence suggesting that Rutkowski and Grayson harbored animosity towards them and intended to besmirch their reputations. Rutkowski rejected Grayson's first draft of the First Affidavit, *id.* ¶ 27, and testified that it "needed to be strengthened because at this point I'm very upset with the tenants that have been antagonistic and argumentative from the day they moved in and I felt that the judge should be aware of that." *Id.* ¶ 27; ECF No. 164-12 at 41–43 (Grayson testifying that language in the First Affidavit was added because "Rutkowski wanted it in the affidavit…They are his words…those would be my client's words…They're all Mr. Rutkowski's words."). Following Rutkowski's input, the First Affidavit contained the following statements:

> Before I address the substance of the Motion to Disqualify, I want the Court to know that the Plaintiffs, especially Attorney Mark Getachew, are the singularly least professional, least honest (read dishonest), least moral people I have dealt with in my 40 plus years of professional life. . . The Getachews are the worst type of tenants one can imagine. While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the Covid epidemic, and have taken advantage of the no-eviction moratorium in NY enacted by Governor Cuomo and now here, the moratorium in Connecticut enacted by Governor Lamont. . . this is clearly a tactical move by Attorney Getachew who I find, and given my experience in dealing with corporate America, to be of the lowest ethical and professional standards I have ever encountered.

ECF No. 182-3 ¶¶ 2, 3, 13.  For his part, Attorney Grayson testified that he thought the Getachews' motion to disqualify was "actually disgusting . . . I thought it was disgusting, that motion, the biggest bullshit crap I've ever seen." ECF No. 182-1 at 32. And after the Post article was published, Grayson emailed a link to it to Danzi and wrote that it was "Pulitzer material."  ECF No. 182-10 at 6.

The Getachews also point to evidence upon which a reasonable factfinder could conclude that Rutkowski participated in a plan to load up the First Affidavit with disparaging comments about the Getachews so that they could get that language into the Post article. First, Rutkowski and Grayson were in frequent communication when Attorney Grayson allegedly threatened Attorney Baker on the phone and before the filing of the First Affidavit. His time entries reflect that Attorney Grayson spoke with Rutkowski on at least seven occasions in this period. ECF No. 182-8 at 3–4. Second, Rutkowski was the one who insisted on adding the disparaging allegations to his affidavit that made their way into the Post article. ECF Nos. 182-31 ¶¶ 26-28; 164-12 at 41–43. Third, Rutkowski asked Grayson for the contact information of the New York Post reporter. Five days prior to the article's publication, Grayson sent Rutkowski this email at 5:00 pm: "*You requested* Julia Marsh's email, here it is: jmarsh@nypost.com." ECF No. 182-29 at 2 (emphasis added).  Six minutes later, at 5:06pm, Rutkowski texted Attorney Grayson "Let's wait for Judge ruling." ECF No. 182-21 at 4. The Getachews contend, and I agree, that a reasonable factfinder could understand this text as an instruction to wait to contact the Post until after the motion to disqualify was decided. It appears Attorney Grayson complied with this instruction, as on October 20, 2020, immediately after the State Court denied the motion to disqualify, Grayson reached out to the Post. ECF No. 155-10 at 3 (October 20, 2020 email from Grayson to Post reporter Julia Marsh). Fourth, that same day, and prior to the article's publication, Attorney Grayson forwarded his email thread with DeGregory, the other Post reporter, to Rutkowski, asking if he had better photos of the Property. ECF No. 182-30 ¶ 26. Attorney Grayson also left Rutkowski a voicemail asking him to send photos of the Property, and Rutkowski emailed Attorney Grayson multiple photos of the Property later that day. *Id.* ¶¶ 28, 29; *see also* ECF No. 182-28 (October 20, 2020 emails from Rutkowski to Grayson attaching pictures of the Property). Fifth, Attorney Grayson

repeatedly testified that Rutkowski confirmed the photo of Mark Getachew in the article before the article was published. ECF No. 182-1 at 14–16. Contemporaneous emails from Grayson to DeGregory represent that Rutkowski did confirm the picture of Mr. Getachew. ECF No. 182-26 at 2 (DeGregory: "Can your client confirm that this is Mr. Getachew? Thanks!" Grayson: "Yes he can." DeGregory: "So to clarify, your client confirms this is Mr. Getachew? Thanks!" Grayson: "Yes."). Grayson also texted Rutkowski prior to the article's publication, saying "Check your email. Is that a pic of [G]etachew." ECF No. 182-21 at 5. Viewing this evidence in the light most favorable to the Getachews, a reasonable factfinder could find that Rutkowski and Grayson worked together to carry out Grayson's threat of defaming the Getachews via the First Affidavit.

There is also evidence upon which a reasonable fact finder could conclude that Rutkowski knew that the language he added to the First Affidavit was improper. When the First Affidavit was filed, Rutkowski had been involved in other landlord-tenant disputes, including at the Property. ECF No. 182-3 ¶¶ 10–11. Rutkowski cast himself as a sophisticated businessman. *Id.* ¶¶ 2, 11 ("…my 40 plus years of professional life - ***including my extensive time as an Executive of Public Corporations***…I am the former Chief Financial Officer and/or Controller of a number of private and publicly traded companies including, Petco, Primedia, Warnaco…, NBC/General Electric and Walt Disney Company"). And Attorney Grayson had represented Rutkowski for years, including in litigation concerning the Property. *Id.* ¶¶ 9–10 ("I have special relationship with Attorney Eric Grayson as he has been representing me in transactional and litigated matters for years, especially as it comes to real estate matters…Attorney Grayson has represented me on a number of occasions regarding the lease of [the Property]."). On this evidence, a reasonable fact finder could find that Rutkowski understood the purpose of the motion to disqualify and knew that the disparaging

17

language he added to the First Affidavit was not germane to whether Attorney Grayson should be disqualified.

Further, there is evidence from which a reasonable factfinder could infer that Rutkowski did not want Grayson to serve as his lawyer because he knew that he would need him as a witness in the State Court Action. On October 20, 2020, the State Court denied the Getachews' motion to disqualify Attorney Grayson. ECF No. 182-30 ¶ 23. But Rutkowski later replaced Grayson as his counsel in that action. ECF No. 182-2 at 5. Rutkowski testified that he did so due to Attorney Grayson's "potential conflict that had been raised by Attorney Baker as to him being a witness as well as serving as counsel." *Id.* at 6. *See also id.* at 8 ("he would likely be called as a witness into the Getachew trial, and we just said it's getting very muddy at this point and that I might be better served by Day Pitney."). While there was nearly a two-year interval between the filing of the First Affidavit and Rutkowski's replacement of Grayson as his lawyer, a reasonable factfinder, considering all of the evidence in the light most favorable to the Getachews, could still infer that Rutkowski knew when he signed the First Affidavit that he would ultimately replace Grayson as his lawyer once trial approached.

All of this evidence, when construed in the light most favorable to the Getachews, suggests that the First Affidavit was submitted primarily for an improper purpose, *i.e.*, to besmirch the Getachews' reputations in the media, rather than to oppose the motion for disqualification. *See Davis v. United States*, 2007 WL 9753132, at *5 (D. Conn. Feb. 27, 2007) (material fact suggesting a "collateral advantage" extraneous to underlying proceedings is sufficient for claim to survive summary judgment because a plaintiff need not "conclusively demonstrate the primacy of the alleged improper purpose to survive summary judgment. In fact, where the factual allegations of

the plaintiff are material to an abuse of process claim, distinguishing between 'primary' and 'secondary' purposes edges quite close to the province of the trier of fact").

### *The PJR Application*

I find that the Getachews have pointed to evidence that, viewed as a whole and in the light most favorable to them, would permit a reasonable factfinder could conclude that the PJR Application was filed primarily for an improper purpose rather than to seek a prejudgment attachment for the L&S Defendants' counterclaims.

The following facts are undisputed: In December 2020, the L&S Defendants filed an answer, special defense, and counterclaim in the State Court Action. ECF No. 182-31 ¶ 53. The counterclaim asserted breach of contract, conversion, statutory theft, unjust enrichment, and CUTPA violations against the Getachews. *Id.* ¶ 54. The L&S Defendants claimed $2,914,687 in actual damages for, among other things, unpaid rent and lost opportunity in selling the Property. *Id*. The L&S Defendants also claimed treble damages (three times the amount of their actual damages) in the amount of $8,744,061 under Connecticut's statute for statutory theft. *Id.* ¶ 54. The L&S Defendants filed a PJR Application on December 7, 2020. *Id.* ¶ 57. Connecticut law allows defendants filing counterclaims for money damages to seek prejudgment remedies, *id.* ¶ 58, and provides for the trebling of damages for statutory theft. *Id.* ¶ 59. The PJR Application requested that the State Court attach $8,744,061 of Plaintiffs' assets to secure satisfaction of a potential judgment on the L&S Defendants' counterclaims. ECF No. 182-30 ¶ 35. The PJR Application was supported by the PJR Affidavit, in which Rutkowski stated that the "Getachews are highly unethical individuals, shysters, deadbeats and squatters… 'no rent' garbage made up by two dead beat shyster/squatters." ECF No. 182-13 ¶¶ 7, 12.

The Getachews contend that the $8.7 million sought in the PJR Application was grossly excessive and was filed to intimidate and embarrass them. The defendants defend the amount sought because, "at that time, the Getachews had changed the locks and refused to provide the L&S Defendants with a landlord's copy, refused to pay rent for five months—since July of 2020— and had refused to allow Mr. Rutkowski to enter the Property to assess the damage from a hurricane. The L&S Defendants considered this to be a statutory theft of the Property because the Property 'was in effect stolen.'" ECF No. 182-30 ¶ 36; *accord* ECF No. 182-31 ¶ 62. The L&S Defendants claim that "Attorney Grayson calculated that the L&S Defendants' actual damages were $2,914,687, consisting of the fair market value of the Property plus the outstanding charges for the unauthorized alterations to the Property, as well as reasonable attorneys' fees." *Id.* ¶ 37. The L&S Defendants contend that "Attorney Grayson further advised Mr. Rutkowski that, under the Connecticut statute for statutory theft, the L&S Defendants' actual damages could be trebled, which amounted to $8,744,061. Mr. Rutkowski relied on Attorney Grayson's calculations in agreeing to the PJR Application." *Id.* In a discovery response, the L&S Defendants asserted that "the sale of [the Property] was thwarted by the Getachews' continued residence there." ECF No. 164-8 ¶ 2. Grayson's factual account of the PJR Application seems to differ only insofar as he contends that Rutkowski, not he, calculated the damages figure, ECF No. 182-31 ¶ 55 ("Rutkowski's calculation of his damages…"). The damages calculation set forth in the counterclaim details that $2,644,487 of the actual damages total ($2,914,687) is attributable to "lost opportunity in selling the house." *Id.*

But Rutkowski's account of his decision to withdraw the PJR Application eleven weeks after filing it raises a question about whether he ever actually believed the Property was stolen. In his statement of material facts, Rutkowski states that "On February 23, 2021, after the Getachews

had paid the outstanding rent, the L&S Defendants withdrew their PJR Application." ECF No. 182-30 ¶ 38. In his deposition, when asked why the PJR Application was withdrawn, Rutkowski testified that "Because at that point the -- both Governor Lamont's moratorium was being lifted. The plaintiffs had requested for all future rent to be put in escrow. That was denied and it seemed like we had a path -- Oh, and they had started making payments of rent, including restitution of the six months of unpaid rent as of -- by February, I think, mid- -- February 11, mid-February." ECF No. 164-11 at 23. Neither explanation made any mention of the changed locks or inability to access the Property, his previously proffered basis for the "theft" claim.

Further, when asked at his deposition if, at the time he filed the PJR Application, he felt as though he had actually been damaged in the amount of the fair market value of the Property, Rutkowski answered "there was no certainty on when I might get this home[,] what condition it would be[,] and to the extent *[sic]*. So if I knew for certain I was getting the home back and that it wasn't completely destroyed, probably the amount of damages would have been less than the fair value of the home." ECF No. 182-5 at 8. But Rutkowski does not allege that he had reason to believe that either the Getachews were "completely destroy[ing]" the Property or that he would not eventually "get this home" back; he does not suggest, for example, that the Getachews had created a fake deed or sought to interfere with title to the Property. And as an assertedly sophisticated businessman who had worked with a lawyer on other landlord-tenant disputes, it is at least questionable whether he actually believed that non-rent-paying tenants—difficult though they might be—had actually stolen the Property. Finally, for the same reasons, a reasonable factfinder could conclude that he knew that his name-calling of the Getachews had no proper place in a PJR application, and that his primary intent was to file an excessive and insult-laden PJR Application to further embarrass the Getachews (*see* ECF No. 182-13 ¶¶ 7, 12) and to pressure

them to pay more than they owed. *See Coppola Const. Co. v. Hoffman Enters. Ltd. P'ship*, 157 Conn. App. 139, 195–96 (2015) ("The court in the present case did not find that the plaintiff committed an abuse of process simply because it had filed a mechanic's lien that was in excess of what it ultimately determined the plaintiff was in fact due and owing. Here, the court found that the plaintiff knowingly and intentionally filed a manifestly excessive lien, primarily for an improper purpose."); *see also Bernhard-Thomas Bldg. Sys., LLC v. Dunican*, 100 Conn. App. 63, 79 (2007), *aff'd*, 286 Conn. 548, 944 A.2d 329 (2008) (allegations that defendant sought application for prejudgment remedy to embarrass, "if proven, might show an ulterior, perhaps even malicious, motive associated with an application for a prejudgment remedy.").

And if the factfinder concluded that Rutkowski did not believe that the Getachews had stolen the Property, the factfinder could attribute that improper purpose to Attorney Grayson, who Rutkowski testified counseled him about the PJR Application and calculated the damages. ECF No. 164-11 at 18 ("A: I believe that Attorney Grayson mentioned treble damages in the case that somebody has taken illegal control of your property."); *id.* at 20 ("Q: Did you believe you were damaged in the amount of the fair market value of your home? A: Again, this was on the advice of counsel, a calculation that he had pointed out in Connecticut law. He had calculated that and I followed the advice of counsel.").

### B. Defendants' Legal Arguments Fail

In support of their motions for summary judgment, the defendants make several legal arguments. For the following reasons, these arguments fail.

### i. The Litigation Privilege Does Not Apply

The defendants argue that the litigation privilege bars the Getachews' abuse of process claim. ECF Nos. 155-1 at 41–43; 164-1 at 29. The Getachews respond that Judge Hall's ruling on

the motions to dismiss, which rejected this argument, forecloses relitigating this issue here. ECF No. 182 at 61. "The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons" for doing so. *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008). I find that the defendants have not offered cogent or compelling reasons to revisit Judge Hall's ruling on this subject.

The cases the defendants cite for the proposition that recent rulings permit the application of the litigation privilege to abuse of process cases still recognize that the litigation privilege does not apply to abuse of process claims where that claim is sufficiently alleged. *Brown v. Carrington Mortg. Servs.*, 2025 WL 2783593, at *9 (D. Conn. Sept. 30, 2025) (the "litigation privilege…does not bar a plaintiff from 'attempting to impose liability upon a litigant for his improper use of the judicial system itself,' such as through an abuse of process claim… to prevail on an abuse-of-process exception, a movant must allege [the elements of an abuse of process claim."); *Chien v. Jensen*, 2025 WL 1135407, at *5 (D. Conn. Apr. 16, 2025) ("These claims, on their face, appear to allege abuse of the litigation process—meaning, of course, that the litigation privilege would not serve as an able shield against them. But affixing the label of 'abuse of the litigation process' to a claim is not sufficient to defeat the assertion of the litigation privilege…Here, Plaintiff does not sufficiently allege (or allege at all) any facts to support a claim that Jensen 'used any litigation or legal process to accomplish a purpose for which it was not designed.'"); *Ammar I. v. Dep't of Child. & Fams.*, 351 Conn. 656, 673 (2025) ("If the plaintiff had prevailed on his discrimination claim in the child protection case, he could have attempted to use that finding to seek authorization from the claims commissioner to bring a vexatious litigation or *abuse of process claim, to which the litigation privilege does not apply*, against the state in court for the defendant's actions") (emphasis added); *Natiss v. Natiss*, 2025 WL 2675495, at *4 (D. Conn. Sept. 18, 2025) (litigation

privilege applies to claims for civil forgery; common-law fraud; violation of CUTPA; violation of New York General Business Law; common-law fraudulent concealment; and common-law civil conspiracy but "does not apply to 'causes of action alleging the improper use of the judicial system.'").

Defendants' argument that Mr. Getachew's deposition testimony demonstrates that the abuse of process claim is actually a defamation claim is insufficient to recast the claim as a defamation claim (to which the litigation privilege would apply, *Davis v. Lapish*, 2019 WL 5964792, at *1 (D. Conn. Nov. 13, 2019)) in light of the fact that the Getachews have pointed to evidence on which a reasonable factfinder could find in their favor on the abuse of process claim, as discussed above.

### ii.   The Advice of Counsel Defense Does Not Warrant Summary Judgment

Defendant Rutkowski argues that he is shielded from liability "so long as [he] subjectively and in good faith relied on the advice of counsel." ECF No. 155-1 at 41. No federal or State Supreme or Appellate Court decision in Connecticut has found that the advice of counsel defense applies to bar an abuse of process claim,[2] but even assuming that the defense is available to Rutkowski, there are disputed issues of material fact that preclude summary judgment on this basis.

---

[2] Rutkowski's contention that *PUMC Holding Corp. v. Robertson*, 2019 WL 2374351, at *3 (Conn. Super. Ct. May 8, 2019), shows that "Connecticut courts have allowed defendants to raise the [advice of counsel] defense against abuse of process claims," ECF No. 155-1 at 37, is a considerable overstatement. In *PUMC*, the court, in granting a motion to strike the special defense of advice of counsel, evaluated whether the defendant properly designated the cause of action to which that special defense applied, finding that it would state a defense to a vexatious litigation suit and observing, in dictum, that it "may state a proper defense to abuse of process," citing *Rogan v. Rungee*. *PUMC*, 2019 WL 2374351, at *3; *compare id.* ("Here, the advice of counsel defense . . . *would* state a defense to the vexatious litigation claims . . . *because it negates* the required element that the previous litigation was commenced without probable cause") (emphasis added) *with id.* ("Advice of counsel *may* state a proper defense to abuse of process because it *could* negate the use of process for an improper purpose element of that tort.") (emphasis added). *Rogan*, however, contains no discussion of the advice of counsel defense in an abuse of process case, and instead shows that an abuse of process can occur notwithstanding an attorney's view that a legal action was proper when that view is contradicted by evidence reasonably interpreted to mean that the lawsuit "achieved its

Usually in connection with a claim for vexatious litigation, courts in Connecticut have described the elements of the advice of counsel defense as follows:

> The defense [of advice of counsel] has five essential elements. First, the defendant must actually have consulted with legal counsel about his decision to [take the challenged action] ... Second, the consultation with legal counsel must be based on a full and fair disclosure by the defendant of all facts he knew or was charged with knowing concerning the basis for his contemplated ... action ... Third, the lawyer to whom the defendant turns for advice must be one from whom the defendant can reasonably expect to receive an accurate, impartial opinion as to the viability of his claim ... The fourth element ... is, of course, that the defendant, having sought such advice, actually did rely upon it ... Fifth and finally, if all other elements of the defense are satisfactorily established, the defendant must show that his reliance on counsel's advice was made in good faith.

*Rieffel v. Johnston-Foote*, 165 Conn. App. 391, 406–07 (2016). The record in this case presents issues of fact that are material to several of these elements. As to the third element, a reasonable fact finder could conclude that Rutkowski could not reasonably have expected to receive an accurate, impartial opinion from Attorney Grayson given Grayson's personal interest at stake in the disqualification motion. As to the fourth element, a reasonable fact finder could conclude that Rutkowski's actions were not all in reliance on Grayson's advice: Rutkowski rejected Grayson's first draft of the First Affidavit, and the additions of inflammatory language were Rutkowski's. ECF Nos. 182-31 ¶¶ 26–28; 164-12 at 41–43 (Grayson testifying that language in the First Affidavit was added because "Rutkowski wanted it in the affidavit…They are his words…those would be my client's words…They're all Mr. Rutkowski's words."). Likewise, Attorney Grayson contends that the idea about the Property being "stolen" came from Rutkowski, not him. ECF Nos. 164-1 at 9 ("At the time the PJR Application was filed, Rutkowski believed that 'the home was in effect stolen and therefore the sale was thwarted.'"); 182-31 ¶ 55 ("Rutkowski's calculation of his damages…"); *id.* ¶ 62 ("At the time the PJR Application was filed, it was Rutkowski's

---

intended purpose [of intimidating] the defendant from making further lawful complaints to the police." 165 Conn. App. 209, 221 (2016).

understanding that 'the home was in effect stolen and therefore the sale was thwarted.'"). And lastly, as to the fifth element, a reasonable fact finder could conclude that any reliance on Grayson's legal advice was not in good faith given Rutkowski's animus toward the Getachews and plan to besmirch them in the media.

### iii. The Fair Reporting Privilege Does Not Apply

Attorney Grayson argues that his free speech rights and Connecticut's fair reporting privilege protect his right to contact the New York Post. ECF No. 164-1 at 38. The Getachews do not dispute that Attorney Grayson has a right to draw a reporter's attention to an affidavit filed in court. But they argue that he does not have a right to use legal process—in this case, the affidavit filed to oppose the motion to disqualify—primarily to besmirch the Getachews' reputation.

I find that the fair report privilege does not apply here because it does not apply to abuse of process claims. The fair report privilege protects accurate reports to the media about issues of public concern. *Elder v. 21st Century Media Newspaper, LLC*, 204 Conn. App. 414, 422 (2021). But the privilege is limited to defamation actions:

> The fair report privilege is well established. The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported. If the report is accurate or a fair abridgment of the proceeding, *an action cannot constitutionally be maintained for defamation*. . . . The privilege exists even though the publisher himself does not believe the defamatory words he reports to be true, and even when he knows them to be false and even if they are libel per se.

*Id.* (internal quotation marks and citations omitted; emphasis added). *See also Sig Sauer, Inc. v. Jeffrey S. Bagnell, Esq., LLC*, 2023 WL 4421769, at *2–3 (D. Conn. July 10, 2023) ("Under the fair report privilege, . . . if a published report is an accurate or a fair abridgment of a proceeding . . . , an action *cannot constitutionally be maintained for defamation* . . . . The law does not generally draw a distinction *in the defamation context* between the protections accorded to media

entities and those accorded to non-media entities") (internal quotation marks, citations, and alterations omitted; emphasis added); *Kelley v. Bonney*, 221 Conn. 549, 576 (1992) ("Publication to the media of material that the media was independently entitled to view, however, cannot provide a basis *for a claim of defamation*.") (emphasis added); *Idlibi v. Hartford Courant Co.*, 216 Conn. App. 851, 864 (2022), *aff'd,* 350 Conn. 557 (2024) ("because the defendant's statement . . . was a fair and accurate abridgement, the fair report privilege applies as a matter of law and shields the *defendant from liability for defamation* as to this statement.") (emphasis added). Attorney Grayson has cited no Connecticut state or federal case applying the fair report privilege to abuse of process claims. This is not surprising because an abuse of process claim targets the use of legal process primarily for an improper purpose, not the mere dissemination to the media of papers filed in court.

## V.      Conclusion

For the reasons set forth above, Defendants' Motions for Summary Judgment are DENIED. Accordingly, this case will proceed to trial. Trial is scheduled for April 29, 2026. The Joint Trial Memorandum and motions in limine are due April 9, 2026. The parties shall follow the undersigned's instructions regarding the Joint Trial Memorandum for a bench trial, except that the parties should not submit proposed findings until after the evidence is presented. Responses to motions in limine are due April 16, 2026. A pretrial conference is scheduled for April 22, 2026 at 2:00 p.m.

IT IS SO ORDERED.

_____
                      /s/

Michael P. Shea, U.S.D.J.

Hartford, Connecticut
February 26, 2026

27