**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| A. MARK GETACHEW and DENORA M. GETACHEW<br><br>Plaintiffs,<br>v.<br><br>L&S INVESTMENTS, LLC., LAWRENCE R. RUTOWSKI, and ERIC GRAYSON<br><br>Defendants. | No. 3:23-cv-01381-MPS |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

### I. Introduction

In an October 12, 2020 affidavit filed in a state court lawsuit, a landlord made insulting statements about his tenants, a married couple, and voiced frustration about his inability to evict them due to an eviction moratorium adopted by Connecticut's Governor as a COVID-19 relief measure. About a week later, the New York Post quoted the statements in an article about the dispute, allegedly damaging the reputations of the tenants, both of whom are professionals. In this ensuing lawsuit brought by the tenants against the landlord for abuse of process, I must decide whether the First Amendment or the common-law litigation privilege shields the landlord and his lawyer from liability. I find that both do because the tenants' complaint in this action seeks damages for reputational harm caused by the words used in the affidavit (and a similar later-filed affidavit) filed in the state court lawsuit. I reserve judgment on whether another filing in the same state court lawsuit – an application for prejudgment remedy (the "PJR Application") that allegedly sought a grossly excessive amount – may serve as a basis for the tenants' abuse of process claim until I review further briefing from the parties.

Plaintiffs Mark and DeNora Getachew ("the Getachews") bring this action for abuse of process against L&S Investments, LLC ("L&S"), Lawrence Rutkowski ("Rutkowski," and together with L&S, "the L&S Defendants"), and Attorney Eric Grayson ("Attorney Grayson" or "Grayson" and collectively with the L&S Defendants, the "Defendants"). I earlier denied the Defendants' motions for summary judgment, but at my invitation, the L&S Defendants and Grayson each filed a second set of motions for summary judgment, this time asserting principally First Amendment grounds.

For the reasons set forth below, the motions are GRANTED, except as to the PJR Application, about which further briefing is needed.

## II. Factual and Procedural History

### A. Factual Background

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits,[1] and my ruling on the first round of motions for summary judgment, and are undisputed unless otherwise indicated. For more detailed factual background, see my earlier summary judgment ruling – *Getachew v. L&S Invs., LLC.*, 2026 WL 851408, at *1–4 (D. Conn. Feb. 26, 2026).

In April 2020, in response to the COVID-19 pandemic, Connecticut's Governor Lamont issued a series of executive orders that restricted evictions in the state. ECF No. 358 ¶ 4. Subsequent executive orders continued the eviction moratorium through January 1, 2021. *Id.* ¶¶ 4, 34. In May 2020, the New York Post published an article about a similar moratorium in New York entitled "Non-Eviction Order leads to Squatting in Style in the Hamptons," and the Daily Mail

[1] When I permitted the Defendants to file motions for summary judgment on their speech-related affirmative defenses, I instructed that the "motions should be confined to the existing summary judgment record" and that the parties could file a motion for permission to include any new exhibits. ECF No. 332. The Defendants did file such motions, and I granted them. Citations here refer to exhibits filed in both rounds of summary judgment briefings.

published a similar article entitled "Wealthy tenants are SQUATTING in multi-million dollar homes in the Hamptons and refusing to pay rent after NY issued a non-eviction order due to the coronavirus crisis." *Id.* ¶¶ 9–10.

In early 2020, the Getachews sought to leave New York due to the pandemic. *Id.* ¶¶ 5–8. In June 2020, the Getachews entered into a lease for a large home in Greenwich, Connecticut (the "Property") owned by a trust associated with the L&S Defendants. *Id.* ¶ 11. Almost immediately after they took possession of the Property, disputes erupted over the Getachews' claims that the condition of the Property, and particularly the condition of the pool, had been misrepresented. *Id.* ¶ 14.

The Getachews sued the L&S Defendants in Connecticut Superior Court for breach of contract and fraud-related claims (the "State Court Action"). ECF No. 357 ¶ 11. In their complaint, the Getachews asserted that the L&S Defendants had made material misrepresentations about the condition of the home and had violated the lease. *Id.* ¶ 12. Attorney Grayson, who had represented the L&S Defendants in the lease negotiations, appeared as counsel for the L&S Defendants in the lawsuit. *Id.* ¶ 13. The Getachews moved to disqualify Attorney Grayson on the ground that he was a necessary witness. *Id.* ¶ 14. Attached to the motion was an affidavit executed by Mark Getachew. *Id.* ¶ 15. On October 12, 2020, the L&S Defendants filed an objection to the motion, which included as an attachment an affidavit by Rutkowski (the "First Affidavit"). *Id.* ¶ 16; ECF No. 358 ¶ 36. The First Affidavit contained the following statements:

> Before I address the substance of the Motion to Disqualify, I want the Court to know that the Plaintiffs, especially Attorney Mark Getachew, are the singularly least professional, least honest (read dishonest), least moral people I have dealt with in my 40 plus years of professional life . . . . The Getachews are the worst type of tenants one can imagine. While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the Covid epidemic, and have taken advantage of the no-eviction moratorium in NY enacted by Governor Cuomo and now here, the

> moratorium in Connecticut enacted by Governor Lamont . . . this is clearly a tactical move by Attorney Getachew who I find, and given my experience in dealing with corporate America, to be of the lowest ethical and professional standards I have ever encountered.

*Getachew*, 2026 WL 851408, at *3. The reference to the eviction moratorium in New York included a footnote containing links to the New York Post and Daily Mail articles. ECF No. 164-20 at 2 n.1. The trial court denied the motion to disqualify on October 20, 2020. *Id.*

The following day, on October 21, 2020, the New York Post published an article about the State Court Action entitled "Ex-Disney CFO claims couple squatting in his $2.2M Connecticut mansion." *Id.* at *4. The article led with a photo of Mark Getachew and quoted from the First Affidavit, including Rutkowski's statements that the Getachews "are the singularly least professional, least honest . . ., least moral people I have dealt with in my 40 plus years of professional life"; "The Getachews are the worst type of tenants one can imagine"; and "While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the COVID epidemic, and have taken advantage of the no-eviction moratoriums . . ." *Id.*

On December 2, 2020, the L&S Defendants filed an answer, special defense, and counterclaim in the State Court Action. ECF No. 358 ¶ 44. The counterclaim sought $2,914,687 in actual damages. *Id.* ¶ 46. The L&S Defendants also claimed treble damages and/or punitive damages in the amount of $8,744,061. *Id.* ¶ 47. On December 7, 2020, the L&S Defendants filed an Application for Prejudgment Remedy ("PJR Application") pursuant to Connecticut General Statutes § 52-278i. *Id.* ¶ 48.[2] The PJR Application was withdrawn by Rutkowski on February 23,

---

[2] As Grayson has noted, my initial summary judgment ruling incorrectly stated that "[t]he PJR Application was supported by a December 10, 2020 affidavit sworn by Rutkowski." 2026 WL 851408, at *4. In fact, Rutkowski filed a short affidavit supporting the PJR Application on December 7, 2020, which, though it accused the Getachews of "squatting," did not include the other derogatory language quoted in my ruling describing the Getachews as "highly unethical individuals, shysters, deadbeats and squatters . . .

2021 after the Getachews paid "all of the outstanding rent then due and owing" earlier that month. *Id.* ¶¶ 58, 60.

In January 2022, the Getachews filed a motion for partial summary judgment in the State Court Action. *Id.* ¶ 28. On March 14, 2022, Rutkowski filed papers in opposition to the motion, which included an affidavit ("Second Affidavit").[3] ECF No. 358 ¶ 65. In the Second Affidavit, Rutkowski stated that the Getachews took possession of his property with no intention to pay rent; abused the eviction moratorium; used the pool for two seasons and then vacated, leaving the landlord "'holding the bag' and having to cover the carrying costs, as well as the lost rent from September 1, 2021-May 31, 2022"; and "breached the lease and walked away" after taking advantage of the 2021 pool season. *Id.* ¶¶ 66–67. Rutkowski also stated that the Getachews made unauthorized repairs, damaged the Property, terminated contractors without authorization, and refused to provide access to the Property. *Id.* ¶ 68.

On October 23, 2023, Grayson filed an action in the Superior Court, styled *Grayson v. Spears Manning & Martini, et al.,* FST-CV23-6063705-S ("Grayson Action"), and naming the Getachews and their lawyers as defendants. *Id.* ¶ 84. "Grayson [was] pursuing three claims: a declaratory judgment that his interactions with the New York Post [about the State Court Action] were constitutionally protected exercises of his First Amendment right to speak freely with the

---

'no rent' garbage . . . ." *Id.* That language appeared instead in a December 10, 2020 affidavit by Rutkowski (the "Rent Affidavit") that was filed in opposition to the Getachews' motion for an order allowing them to pay rent into court. ECF No. 182-13.

As Grayson points out, "the Rent Affidavit . . . is not alleged to be an act of abuse of process and is not mentioned anywhere in the Complaint." ECF No. 310 at 10 n.1. *See* ECF No. 1. The Rent Affidavit is not mentioned in either motion for summary judgment, ECF Nos. 340, 338, either Local Rule 56(a)(2) Statement, ECF Nos. 357, 358, or the Getachews' opposition to the motions. ECF No. 356. The only mention of the Rent Affidavit appears in one paragraph of the Getachews' "Additional Statement of Material Facts," ECF No. 357 (Additional Statement of Facts) ¶ 25. Because the Getachews do not use the Rent Affidavit to "establish genuine issues of material fact precluding summary judgment in favor of the moving part[ies]," I do not consider it. D. Conn. L. Civ. R. 56(a)(2)(ii).

[3] I previously referred to this affidavit as the "Summary Judgment Affidavit," *see Getachew*, 2026 WL 851408, at *4, but adopt the parties' convention here.

press about a matter of public concern; abuse of process; and vexatious litigation." ECF No. 338-3 at 3. In the Grayson Action, the Getachews' co-defendants filed a "special motion to dismiss" under the Connecticut Anti-SLAPP statute, Conn. Gen. Stat. § 52-196a. ECF No. 358 ¶ 85. The Getachews' co-defendants argued that because of the October 21, 2020 article in the New York Post, the State Court Action "indisputably became a matter of public concern." *Id.* ¶ 87; *see also* ECF No. 338-3 at 3, 6. The Getachews' co-defendants also argued that the Grayson Action was "based on the exercise of their right to petition the government regarding a matter of public concern." ECF No. 338-3 at 5, 14. The Getachews filed their own special motion to dismiss adopting the arguments of their co-defendants. ECF No. 358 ¶ 86; *see also* ECF No. 338-2 at 3. On September 25, 2024, the Superior Court dismissed the Grayson Action in part based on findings that adding Grayson as a defendant in this action for abuse of process was "undertaken in connection with" a "petition to the judiciary" related to a "matter of public concern." ECF No. 358 ¶ 90; ECF No. 338-5 at 8, 13.

### B. Procedural History

The operative complaint in this case asserts a single count of abuse of process against L&S, Rutkowski, and Grayson. The complaint alleges that the Defendants filed the First Affidavit, laden with invective having nothing to do with the merits of the motion to disqualify, and then directed the New York Post to the court file, as part of a scheme "to disparage the Getachews and intimidate them into backing away from" their state-court lawsuit. ECF No. 1 ¶ 32. It asserts that the ensuing New York Post article quotes directly from the First Affidavit, including the insults leveled by Rutkowski. The complaint then discusses the damages the Getachews suffered: "The continuing reputational damage and trauma caused to the Getachew family by the New York Post article cannot be overstated." *Id.* ¶ 42. It asserts that "the Getachews are still dealing with the effects of

the article concocted by Defendants Rutkowski and Grayson," and have received "anonymous death threats as a result of this defamatory media coverage." *Id.* ¶¶ 43–44.

The complaint also alleges that the Second Affidavit, which Rutkowski submitted several months after publication of the New York Post article to oppose the Getachews' motion for partial summary judgment, "repeated the reprehensible and damaging language previously quoted by the New York Post … [,] repeated his assertion that the Getachews were 'squatters,'" and "included new assertions" having nothing to do with the merits of the case, including that the Getachews were "nasty and devious people," that Mr. Getachew was a "fraudster," and that the Getachews had used "Stalingrad tactics to attempt to beat L&S into submission." *Id.* ¶¶ 50–51.

Finally, the complaint alleges that Rutkowski submitted an application for prejudgment remedy related to his counterclaim in the State Court Action, which sought "an attachment against [the] Getachews in the absurd and unsupportable amount of $8,744,061," to "pressure [the] Getachews into paying money that they did not owe." *Id.* ¶ 47.

In April, at a pretrial conference a few days before a bench trial was to begin, Grayson's counsel raised a First Amendment issue that prompted me to do further research. After doing that research, I concluded that it would be more consistent with Rule 1 of the Federal Rules of Civil Procedure to call for further briefing on the First Amendment issue than to plow ahead with the trial; and so I permitted the Defendants to file new motions for summary judgment, which are now fully briefed.

## III. Legal Standard

Summary judgment will be granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence,

viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). It is the movant's burden to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant meets its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).

## IV. Discussion

### A. The First Amendment Protects the Statements in the Affidavits

The Defendants move for summary judgment on their affirmative defenses under the First Amendment.[4] ECF Nos. 337; 340. "The Free Speech Clause of the First Amendment—'Congress shall make no law . . . abridging the freedom of speech'—can serve as a defense in state tort suits." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). When speech relates to a matter of public concern,

---

[4] These affirmative defenses assert:

> Plaintiffs' claims are barred by Article 1, Section 10 of the Connecticut Constitution and/or Article 1, Sections 4 and 14 of the Connecticut Constitution and the First and Fourteenth Amendments of the U.S. Constitution because the statements relied upon in the Rutkowski Affidavit are protected speech and mere opinions, and the abuse of process claim seeks to burden access to the Court by the press and inhibit the freedom of speech by the press and the Defendants.

ECF No. 71 at 10; *see also* ECF No. 268 at 8 (same). Because the First Amendment renders the challenged statements in the two affidavits non-actionable, I do not consider whether the Connecticut constitution offers the affidavits any greater speech protection. *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 178 (D. Conn. 2002) ("the First Amendment analysis wholly resolves the issue, so even if the Connecticut constitution gives higher protection to expressive conduct, . . . there is no need for this Court . . . to outline the exact contours of that heightened protection.").

"the speaker may be liable for damage to reputation . . . only if the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. This is true regardless of the claim at issue, be it defamation, intentional infliction of emotional distress, or negligence; heightened First Amendment protections apply to any tort alleging reputational harm as long as the underlying speech relates to a matter of public concern." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 129 (2d Cir. 2013). Further, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). In other words, if a statement (1) relates to a matter of public concern and (2) is not provable as false, it is shielded from tort liability. *Id.* at 19 ("[A] statement on matters of public concern must be provable as false before there can be liability."); *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 149 (2d Cir. 2000) ("[I]n a suit by a private plaintiff involving a matter of public concern, we hold that allegedly defamatory statements must be provably false."); *Dongguk*, 734 F.3d at 129 ("[W]hen speech is related to a matter of political, social, or other concern to the community or when it is a subject of legitimate news interest[,] . . . the speaker may be liable for damage to reputation only if the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not." (internal citations and alterations omitted)).

#### i. The First Amendment Applies to the Getachews' Abuse of Process Claim Based on the First and Second Affidavits But Not the PJR Application

The Getachews contend that the First Amendment does not apply because the tort of abuse of process is not a "tort alleging reputational harm" and that *Dongguk* is inapposite because the plaintiff in that case "brought claims . . . based solely on the *content* of Yale's statements to the media." ECF No. 356 at 18–19 & n.5. But *Dongguk* is clear that its holding applies to "any tort alleging reputational harm" "regardless of the claim at issue." 734 F.3d at 129. And the Getachews,

too, allege reputational harm based on the *content* of the First Affidavit, which was republished in the New York Post. *See* ECF No. 1 ¶¶ 30–31 (discussing content of First Affidavit); *id.* ¶¶ 40–41 (discussing content of First Affidavit reproduced in New York Post article); ¶ 42 ("The continuing reputational damage and trauma caused to the Getachew family by the New York Post article cannot be overstated. . . . Mark and DeNora – both lawyers in New York – were inundated by colleagues, clients, friends and acquaintances, most of whom expressed shock and dismay at the obviously inflammatory and derogatory accusations."); *id.* ¶ 43 ("To this day . . ., the Getachews are still dealing with the effects of the article concocted by Defendants Rutkowski and Grayson."); *id.* ¶ 44 ("[T]he Getachews received anonymous death threats as a result of this defamatory media coverage."); *id.* ¶ 50 ("[In the Second Affidavit,] Defendant Rutkowski repeated the reprehensible and damaging language previously quoted by the New York Post . . . ."). Absent their inflammatory content, the Getachews have pointed to no evidence that there is anything abusive or improper about the affidavits or that they caused any harm. It is neither unusual nor improper for a client to file an affidavit in opposition to a motion to disqualify his attorney, especially when, as here, the opposing party, Mr. Getachew, filed his own affidavit in support of the motion. Nor is it unusual nor improper to file affidavits in opposition to motions for summary judgment. And so while the Getachews urge me to focus not on the statements in each affidavit but on "whether the *filing itself* was primarily designed to accomplish a purpose for which it was not designed," ECF No. 356 at 39–40, there would be no case here if I did so because the filings themselves, divorced of their content, are unremarkable.[5]

[5] The Getachews do not allege that the challenged statements in the First or Second Affidavits led the judge in the State Court Action to rule against them or otherwise had any impact on the outcome of that action.

The Getachews also contend that "First Amendment [p]rotection [t]urns [o]n the interest [p]rotected [b]y [a] [t]ort" and that because abuse of process "protects the integrity of the court system—not reputational harm," it does not implicate the First Amendment. ECF No. 356 at 18, 21. But if litigants could skirt the First Amendment by casting their claims as torts aimed primarily at non-reputational interests, public figures could sue newspapers for negligence when reporters got the story wrong – because the interest protected by a negligence claim is the duty to use reasonable care; and grieving parents of deceased soldiers could sue for intentional infliction of emotional distress those who picket their children's funerals to express disagreement with U.S. policy – because the interest protected by intentional infliction of emotional distress is to deter outrageous conduct causing emotional distress. The robust protection afforded by the First Amendment does not permit either scenario. *New York Times Co. v. Sullivan*, 376 U.S. 254, 287-88 (1964)("We think the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice."); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (vacating multi-million dollar jury award for intentional infliction of emotional distress in suit brought by father of deceased soldier against members of Baptist church who picketed in public space near son's funeral: While picketers' speech was hurtful, it was "entitled to 'special protection' under the First Amendment [because it dealt with matters of public concern], and that protection cannot be overcome by a jury finding that the picketing was outrageous"). The First Amendment forecloses liability for "any tort alleging reputational harm," *Dongguk University*, 734 F.3d at 129, and any tort alleging emotional distress, *Snyder*, 562 U.S. 443, – no matter how the tort is styled – when the alleged harm flows from the content of the speech and the speech relates to a matter of public concern.

The Getachews rely on *Zacchini,* in which the Supreme Court held that the First Amendment did not prevent an entertainer from recovering damages against a TV broadcaster for publishing film of his performance. *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977). Unlike this case, *Zacchini* did not involve allegations of reputational harm, and the Court distinguished between the "right of publicity" at stake in that case and the tort of false light. For the "right of publicity," the Court said, "the State's interest is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation," while the state's interest in providing a cause of action for false light "is clearly that of reputation." *Id.* at 573. "In 'false light' cases the only way to protect the interests involved is to attempt to minimize publication of the damaging matter, while in 'right of publicity' cases the only question is who gets to do the publishing." *Id.* The Getachews' abuse of process claim resembles the false light tort that the *Zacchini* Court held deserved First Amendment protection. *Id.* at 574.

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), which the Getachews also cite, does not help them either. There, the Court held that the First Amendment did not prohibit a confidential source from recovering damages under state promissory estoppel law for newspaper publishers' breach of a promise of confidentiality in return for information. The Court found the case "controlled by . . . the . . . well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press had incidental effects on its ability to gather and report the news." *Id.* at 669. The case did not involve reputational harm or emotional distress, as Cohen's damages stemmed from his employer's firing of him when the newspapers identified him as the source of a story containing derogatory information about a political candidate. *Id.* at 671 ("Cohen is not seeking damages for injury to his

reputation or his state of mind. He sought damages . . . for breach of a promise that caused him to lose his job and lowered his earning capacity.”).

*PJR Application*

The First Amendment does not protect the Defendants, however, from liability for their filing of the PJR Application. The Getachews do not allege that they suffered any reputational harm as a result of the filing of the PJR Application. Nor do they point to any statements in the Application that caused them emotional distress or other harm. Rather, they allege that the request in the Application for an attachment “in the absurd and unsupportable amount of $8,744,061” was an “extortionate method concocted by Defendants Rutkowski and Grayson . . . to pressure Getachews into paying money that they did not owe.” ECF No. 1 ¶ 47.[6]

The Getachews’ claim about the PJR Application is that it was a frivolous pleading filed for an improper purpose, and I found in the previous summary judgment ruling that they have raised a genuine dispute of material fact on that score. *Getachew*, 2026 WL 851408, at *10 (“[A]s an assertedly sophisticated businessman who had worked with a lawyer on other landlord-tenant disputes, it is at least questionable whether [Rutkowski] actually believed that non-rent-paying tenants . . . had actually stolen the Property.”). Frivolous pleadings are not immunized by the First Amendment. *See Bill Johnson’s Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) (“The [F]irst [A]mendment interests involved in private litigation . . . are not advanced when the litigation is based on intentional falsehoods or on knowingly frivolous claims. Furthermore, since sham litigation by definition does not involve a bona fide grievance, it does not come within the first

[6] Even if I accepted the notion suggested by Grayson – that the request for $8.7 million in the PJR Application was itself speech – it would not be speech on a matter of public concern, as will become apparent from the discussion below. Unlike the affidavits, the content of the PJR Application contains no discussion of eviction moratoriums, the COVID-19 pandemic, or governmental policies, and the PJR Application itself is not “sworn testimony.” *See Lane v. Frank,* 573 U.S. 228, 241 (2014).

amendment right to petition. Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." (internal citations and footnotes omitted)).

Grayson also argues that the request for $8.7 million in the PJR Application is a "remonstrance" protected by Connecticut's constitution, but he cites no case law supporting this notion and I am unaware of any. Further, while I express no opinion on the state constitutional question, I am skeptical that Connecticut courts, which have long recognized that filing frivolous papers in court may lead to liability or sanctions, would construe the State's constitution to insulate frivolous claims from all liability. *See, e.g.*, *Bernhard-Thomas Bldg. Sys., LLC v. Dunican*, 286 Conn. 548, 554 (2008) (recognizing cause of action for vexatious litigation "both at common law and pursuant to the statute"); *Berzins v. Berzins*, 306 Conn. 651, 661 (2012) (discussing "the inherent authority of a trial court 'to assess attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons'" (internal citations omitted)); *DiSpazio v. Pacapelli*, 231 Conn. App. 589, 601, *cert. denied*, 352 Conn. 906 (2025) (affirming court's authority to impose sanctions "pursuant to [Practice Book] § 1-25 for filing a frivolous action"). As discussed below, however, I also question whether the filing of a frivolous pleading – even one with an "extortionate" prayer for damages – constitutes an abuse of process under Connecticut law; and so I request further briefs from the parties on that issue.

I next analyze whether the statements in the First and Second Affidavits relate to matters of public concern and whether they are provable as false.

**ii. The Statements in the Affidavits are on Matters of Public Concern**

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of

legitimate news interest; that is, a subject of general interest and of value and concern to the public. The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Snyder*, 562 U.S. at 453 (internal citations and quotation marks omitted). "Whether . . . speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers,* 461 U.S. 138, 147–48 & n.7 (1983). "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 454.

*The First Affidavit*

The content, form, and context of the First Affidavit suggest that it addresses matters of public concern, and the legitimate news interest in the First Affidavit confirms this.

The content of the speech discusses a Connecticut eviction moratorium in place at the time, which was adopted by Governor Lamont as a COVID-19 relief measure. Specifically, the First Affidavit compares the Getachews to "rich entitled people" who are taking advantage of such moratoriums, and cites news articles about the similar New York eviction moratorium. ECF No. 182-3 ¶ 3 ("The Getachews are the worst type of tenants one can imagine. While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the Covid epidemic, and have taken advantage of the no-eviction moratorium in NY enacted by Governor Cuomo and now here, the moratorium in Connecticut enacted by Governor Lamont."); *id.* ¶ 3 n.1–2 (citing Daily Mail and New York Post articles titled "Wealthy tenants are SQUATTING in multi-million dollar homes in the Hamptons and refusing to pay rent after NY issued a non-eviction order due to the coronavirus crisis" and "Non-eviction

order leads to squatting in style in the Hamptons"); *id.* ¶ 4 ("Based on their actions to date, it is clear that they have no intention of paying rent – now or in the future because they know Governor Lamont keeps extending the 'no-eviction' moratorium, and for now, I cannot serve a Notice to Quit until January 2021."). Statewide COVID-19 relief efforts and governmental policies are issues of political and social concern. *See Rankin v. McPherson*, 483 U.S. 378, 386 (1987) ("Considering the statement in context . . . discloses that it plainly dealt with a matter of public concern. The statement was made in the course of a conversation addressing the policies of the President's administration."); *Heim v. Daniel*, 81 F.4th 212, 229 (2d Cir. 2023) ("We have recognized that, whatever other speech may also qualify, discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern." (quotation marks omitted)).

The Getachews argue that the "[t]he statements at issue are purely related to a private dispute between landlord and tenant" and thus do not warrant protection. ECF No. 356 at 29. I agree that the statements relate to a landlord-tenant dispute, but "some topics can both affect a party's personal interests and concern public affairs, yet still . . . land on the protected side of the line." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 43 (1st Cir. 2024); *see also Golodner*, 770 F.3d 196, 203 (2d Cir. 2014) ("[A]n individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large."). In *Berge*, for example, the plaintiff went to the school superintendent's office because "[h]e wanted to buy tickets to his daughter's sold-out school play" and "to hear from officials why the school's COVID-19 rules still capped the number of play-goers when the state had already lifted its COVID-19 mandates." *Id.* at 36. The plaintiff filmed his interactions with school officials and posted the video on Facebook, leading them to threaten legal action against him and ultimately to his bringing a lawsuit of his

own. Despite the defendants' argument that the plaintiff's "visit focused on his concerns rather than the public's," i.e., his desire for tickets to his daughter's play, the court found that his speech was on matters of public concern.

The form and context of the First Affidavit also suggest that it was on a matter of public concern. The First Affidavit was submitted in the State Court Action and Rutkowski "swore to the truth and accuracy of the statements" contained within it. ECF No. 182-3 at 14; *see also id.* ¶ 1 ("I am over the age of 18 and understand the oath. . . . I make this knowledge based on my first-hand knowledge and as to matters stated upon information and/or belief, I believe them to be true."). The Supreme Court has found that "the form and context of the speech—sworn testimony in a judicial proceeding—fortify th[e] conclusion [that the speech involves matters of public concern]. Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotation marks omitted).

Lastly, the First Affidavit is related to matters of public concern because there was legitimate news interest in it and in the State Court Action. National and local news outlets reported on the parties' landlord-tenant dispute and quoted heavily from the First Affidavit. The New York Post article contains the following reporting on the First Affidavit:

> But the couple hasn't paid rent since they moved in in June, taking "advantage of the no-eviction moratorium," according to an affidavit filed by Rutkowski in Norwalk Housing Court.
>
> It is clear that they have no intention of paying rent - now or in the future because they know Governor [Ned] Lamont keeps extending the 'no-eviction' moratorium," Rutkowski alleges in the affidavit.
>
> Rutkowski, a California resident, says what's worse is that "without my consent, the Getachews have performed multiple alterations and have caused significant damage to my house and have run up huge bills in my name (all in violation of the

> lease)," the affidavit continues.
>
> Rutkowski's pool repairman found when he opened the pool for the Getachews that there were some leaking valves and a few other minor repairs that would cost at most $3,000 to repair. But Mark "unjustly fired" the pool repairman, hired his own and "proceeded to run up a $45,000 bill, basically digging up all of the piping around the pool and associated parts of the pool and replacing them," the affidavit says.
>
> This was all done without Rutkowski's permission, he claimed, adding that the situation "has become a nightmare for me."
>
> Denora and Mark - a lawyer at Willkie Farr & Gallagher – "are the singularly least professional, least honest . . ., least moral people I have dealt with in my 40 plus years of professional life," the affidavit alleges.
>
> After problems began with the Getachews in the first month, Rutkowski even offered to release them from the lease.
>
> "The Getachews are the worst type of tenants one can imagine," the affidavit from last week says.
>
> "While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the COVID epidemic, and have taken advantage of the no-eviction moratorium in New York enacted by Governor Cuomo and now here, the moratorium in Connecticut enacted by Governor Lamont," the court papers say.

ECF No. 182-9 at 2–4. Likewise, the Greenwich Time published an article on the front page of the paper titled "Tenant-landlord dispute erupts" that discussed the litigation and the First Affidavit:

> In his affidavit filed earlier this month in Norwalk Housing Court, Rutkowski said that the only month of rent that had been paid was in June. He claims in his affidavit, "While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the COVID epidemic, and have taken advantage of the no-eviction moratorium in New York enacted by Governor [Andrew] Cuomo and now here, the moratorium in Connecticut enacted by Governor [Ned] Lamont."
>
> Striking a personal note, Rutkowski wrote, "The Getachews are the worst type of tenants one can imagine." He said they have "caused significant damage to my house and have run up huge bills in my name (all in violation of my lease)." He maintains [the] Getachews improperly "fired" his pool contractor and made extensive repairs "without my approval or consent."

ECF No. 338-16 at 41–42. Further, the Getachews' expert report and memorandum of law both discussed that after the New York Post article was published, "the story was rapidly picked up and republished by numerous other outlets, both mainstream and niche. Syndicated coverage appeared in the *Fox Business, Greenwich Time, Daily Mail, Daily Beast, Barstool Sports, Above the Law,* and the *ABA Journal,* among others." ECF No. 184-1 ¶ 24; *see also* ECF No. 182 at 18 n.7 ("The originating New York Post . . . article was republished broadly over the internet by dozens of news aggregator websites and online publications, including, but not limited to, Above the Law, The Daily Beast, Daily Mail, Barstool Sports, Westfair Online, and the American Bar Association Journal."). These articles published about the State Court Action and the First Affidavit constitute "legitimate news interest" and underscore that the First Affidavit was speech on "a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453.

The Getachews argue that "[t]he mere fact that this private dispute was publicized does not render it newsworthy." ECF No. 356 at 32 (citing *Koch v. City of Hutchinson*, 847 F.2d 1436, 1448 (10th Cir. 1988) ("Media publicity of the dispute is not determinative of the question of whether Koch's speech was on a matter of public concern for First Amendment purposes.")). But the New York Post article was more than just a one-off piece "engineered" by Grayson to gain leverage in his clients' dispute with the Getachews. The article continued a theme the Post had sounded in its earlier reporting about "wealthy tenants" taking advantage of COVID-related eviction moratoriums. And while I agree that the mere publication of an article about a dispute does not by itself transform the dispute into "a subject of legitimate news interest," *Snyder*, 562 U.S. at 453, the republication of the Post article here in the wide range of media outlets noted by the Getachews' expert is surely some evidence of "legitimate news interest." *See Cioffi v. Averill Park Central School Dist. Board of Ed.*, 444 F.3d 158, 165 (2d Cir. 2006) (stating that where the context of

employee's speech in letter to board of education and in press conference included a "media frenzy" on the subject of the speech, the court "need only look to the abundant press coverage" accorded the subject "[t]o gauge the community's interest" in the speech . . . . [T]he fact of actual public interest further convinces us that [the employee's] communications touch upon matters of public concern"); *Posteraro v. Northport Union Free Sch. Dist.*, 2012 WL 3289009 *3 (E.D.N.Y. Aug. 10, 2012) ("Here, that the incident about which Plaintiff spoke was covered by Newsday suggests a general interest or legitimate news interest in the matter."). Finally, the portion of the First Affidavit that most plainly commented on a matter of public concern – the references to the COVID-related eviction moratoriums – bore more than a tangential link to the rest of the challenged content. In the eight paragraphs of the First Affidavit that the complaint makes the primary basis of the abuse of process claim, Rutkowski repeatedly tied his opinions of the Getachews to his own inability to evict them on account of the moratorium. ECF No. 164-2 ¶ 3 ("The Getachews are the worst type of tenants one can imagine . . . . [T]hey are similar to the type of rich entitled people who have taken over houses in the Hamptons . . . and have taken advantage of the no-eviction moratorium in NY . . . and now, here the moratorium in Connecticut . . . ."); ¶ 4 ("Based on their actions to date, it is clear that they have no intention of paying rent – now or in the future because they know Governor Lamont keeps extending the 'no-eviction' moratorium, and for now, I cannot serve a Notice to Quit until January 2021."); ¶ 7 (averring that "[t]he list of breaches [of the lease] is exhausting," cataloguing Mark Getachew's allegedly unauthorized modifications to the Property, and stating that, "[t]he house is mine not his, but he knows that under the present state of things, I am powerless to evict him").[7]

[7] The cases the Getachews cite to show that the speech at issue here was not on a matter of public concern are distinguishable. *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008) held only that a public employee's speech "is not brought within the protection of the First Amendment by the mere fact that one or two of a public employee's comments could be construed broadly to implicate matters of public

So, I find that the First Affidavit was speech addressing matters of public concern based on the affidavit's content, form, and context, as well as the legitimate news interest in it.

*Second Affidavit*

As the L&S Defendants note (ECF No. 340-1 at 35), neither the complaint nor the report by the Getachews' damages expert suggests that the Getachews were harmed by the Second Affidavit, which was filed some five months after publication of the New York Post article. *See* ECF No. 1 ¶ 42 ("The continuing reputational damage and trauma caused to the Getachew family by the New York Post article cannot be overstated."); ECF No. 184-1 ¶ 69 ("The public circulation of the harmful statements by Mr. Rutkowski in the New York Post's article resulted in both immediate and enduring harm to the Getachews' personal brand and reputational value …."). But even if the filing of the Second Affidavit caused no harm, I must still address whether it should receive First Amendment protection because "nominal damages may be awarded in cases involving intentional torts." 2 D. Pope, Connecticut Actions and Remedies, Tort Law (1993) Sec. 25:24, pp. 25-35 – 25-36, quoted in *Right v. Breen*, 277 Conn. 364, 372 (2006).

I find that the content, form, and context of the Second Affidavit render the speech in it speech on matters of public concern.

---

concern." *BMI Salvage Corp. v. Manion*, 366 Fed Appx. 140 (11th Cir. 2010) involved a series of letters by a commercial lessee of aircraft space complaining about various facilities and services at a local airport. Although the letters "appear[ed] to touch on matters of the concern to the community," such as airport safety issues, they were not filed in court, primarily "concerned [the tenant's] leasehold and the profitability of its business," *id.* at 144, and were not closely linked to a particular government policy or associated with a hot-button issue like COVID-19. *Brady v. Colchester*, 863 F.2d 205 (2d Cir. 1988) did not deal with speech or association at all but simply affirmed the district court's ruling that the act of renting property to a tenant itself was not protected by the First Amendment. *Id.* at 217. The Getachews also argue that the Defendants are making "a blatant attempt to recast private speech . . . as speech on a public issue," but they point to no evidence to suggest that the Defendants, at the time the affidavits were written, added speech on matters of public concern to immunize their personal attacks on the Getachews from civil liability.

The content of the Second Affidavit contains the same discussion of the Connecticut eviction moratorium and the same comparisons of the Getachews to the "rich entitled people" who are taking advantage of such moratoriums. ECF No. 164-35 ¶ 4 ("The Getachews were the worst type of tenants one can imagine. While they appeared to be professional as part of their fraud, they were similar to the type of rich entitled people who took over houses in the Hamptons, supposedly to escape the Covid epidemic, and who took advantage of the no-eviction moratorium in NY enacted by Governor Cuomo and then the moratorium in Connecticut enacted by Governor Lamont."); *id.* ¶ 4 n.1–2 (citing Daily Mail and New York Post articles titled "Wealthy tenants are SQUATTING in multi-million dollar homes in the Hamptons and refusing to pay rent after NY issued a non-eviction order due to the coronavirus crisis" and "Non-eviction order leads to squatting in style in the Hamptons"); *see also* ECF No. 1 ¶ 50 (alleging that the Second Affidavit "repeat[ed] the same disparaging commentary about the Getachews"). For the same reasons I found that the content of the First Affidavit suggested that the speech was on matters of public concern, the content of the Second Affidavit points to the same conclusion.

The form and context of the Second Affidavit also suggest that it was speech on matters of public concern because it was sworn testimony submitted in the State Court Action. ECF No. 164-35 at 14 (Rutkowski "acknowledge[ed]" his oath before a "Commissioner of the Superior Court"); *id.* ¶ 1 ("I am over the age of 18 and understand the oath. . . . I make this knowledge based on my and L&S's first-hand knowledge and as to matters stated upon information and/or belief, I believe them to be true."); *see Lane*, 573 U.S. at 241.

Further, the content of the Second Affidavit discusses the subjects reported on in the New York Post and Greenwich Time articles covering the State Court Action. In other words, the speech in the Second Affidavit was made in, and explicitly related to, the context of extensive news

coverage about the State Court Action. *See* ECF No. 1 ¶ 50 (complaint alleging that "Defendant Rutkowski repeated the reprehensible and damaging language previously quoted by the New York Post (and Greenwich Time) . . . "). Because the content of the Second Affidavit discusses the exact same topics that were the subject of legitimate news interest, it is speech on matters of public concern. *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 165 (2d Cir. 2006) ("Next we examine the context in which Cioffi spoke . . . both the letter and press conference occurred while a media frenzy ensued around the hazing. In short, this is not a case in which we must divine the public's interest in the subject matter of [the] speech. To gauge the community's interest in Cioffi's speech we need only look to the abundant press coverage accorded the hazing . . . the fact of actual public interest further convinces us that Cioffi's communications touch upon matters of public concern."); *Posteraro v. Northport-E. Northport Union Free Sch. Dist.*, 2012 WL 3289009, at *3 (E.D.N.Y. Aug. 10, 2012) ("Here, that the incident about which Plaintiff spoke was covered by Newsday suggests a general interest or legitimate news interest in the matter.").[8]

[8] Grayson contends that judicial estoppel applies based on the Getachews' arguments about "matters of public concern" in the Grayson Action. ECF No. 338 at 15–16. Although it is a close call, I find that judicial estoppel does not apply here because that doctrine "is invoked to protect the integrity of the judicial process from the threat of inconsistent results," *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997), and generally requires that "a party's later position [be] clearly inconsistent with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation marks omitted). Where there is "no risk of inconsistent court determinations," not applying the doctrine "poses little threat to judicial integrity." *Id.* at 751 (quotation marks omitted). The Getachews' arguments in the Grayson Action were made in support of a Special Motion to Dismiss under Connecticut's Anti-SLAPP Statute, Conn. Gen. Stat. § 52-196a. ECF No. 358 ¶¶ 85–87. The arguments were successful insofar as the Superior Court dismissed the Grayson Action in part because it found that the Grayson Action was based on conduct related to a "matter of public concern" under the Anti-SLAPP law. ECF No. 338-5 at 8–13. But the Superior Court's ruling and the Getachews' arguments were based on Section 52-196a(a)(1), which defines "matter of public concern" as "an issue related to (A) health or safety, (B) environmental, economic or community well-being, (C) the government, zoning and other regulatory matters, (D) a public official or public figure, or (E) an audiovisual work." *See* ECF No. 338-3 at 6 (arguing that the Anti-SLAPP statute bars Grayson's claims based on the Spears Manning's exercise of the "right to petition the government on a matter of public concern" and citing Conn. Gen. Stat. § 52-196a(a)(1)); *see also* ECF No. 338-5 at 8, 13 (analyzing Connecticut case law to answer the "question [of] whether the amendment of the complaint to allege the abuse of process claim and to add Grayson as defendant was in connection with a [m]atter of public concern as defined by C.G.S. § 52 -196a" and finding that "the claims against them in this action are based upon

### iii. The Challenged Statements in the Affidavits are Not Provable as False

Because I have found that the First and Second Affidavits relate to matters of public concern, I turn next to whether the statements in the affidavits are "provable as false." *Milkovich*, 497 U.S. at 19.

At the outset, the Getachews object that their "abuse of process claim does not call for an analysis of whether it involves a protected opinion. The fact versus opinion distinction is a defamation construct. . . . While the opinion analysis can extend beyond just the tort of defamation, courts have only extended it to cases where liability was based on the content of speech. Abuse of process, by contrast, does not turn on the content of speech, but requires proof that legal process was used primarily for an improper purpose." ECF No. 356 at 39. As previously discussed, the complaint makes clear that the Getachews' abuse of process claim—and especially their alleged injuries—are "based on the content of speech" in the affidavits and therefore the First Amendment applies. ECF No. 1 ¶¶ 30–31 (discussing the content of the First Affidavit); *id.* ¶¶ 40–41 (discussing content from First Affidavit reproduced in New York Post article); ¶ 42 ("The continuing reputational damage and trauma caused to the Getachew family by the New York Post article cannot be overstated. . . . Mark and DeNora – both lawyers in New York – were inundated by colleagues, clients, friends and acquaintances, most of whom expressed shock and dismay at the obviously inflammatory and derogatory accusations."); *id.* ¶ 43 ("To this day . . ., the Getachews are still dealing with the effects of the article concocted by Defendants Rutkowski and Grayson."); *id.* ¶ 44 ("[T]he Getachews received anonymous death threats as a result of this defamatory media coverage."); *id.* ¶ 45 ("Rutkowski's October 12, 2020

---

their exercise of rights to petition the judiciary in connection with a matter of public concern"). Because the definition of "matter of public concern" under § 52-196a(a)(1) differs somewhat from that under federal law, the Getachews' argument here is not "clearly inconsistent" with their prior position and there is no threat of inconsistent judicial determinations.

affidavit . . . spends eight paragraphs maliciously disparaging the Getachews before even addressing the Motion to Disqualify . . . ."); *id.* ¶ 50 ("[In the Second Affidavit,] Defendant Rutkowski repeated the reprehensible and damaging language previously quoted by the New York Post . . . ."). Further, because the Getachews have pled a "tort alleging reputational harm" and "the underlying speech relates to a matter of public concern," the Defendants may be liable only if Rutkowski's statements were "made with knowledge that [they were] false or with reckless disregard for whether [they were] false or not." *Dongguk University*, 743 F.3d at 129; as I discuss below, however, the Getachews cannot prove that the statements were false because the statements were opinions.

In *Milkovich,* the Supreme Court held that there is no "separate constitutional privilege" for statements of opinion under the First Amendment. *Id.* at 21. Instead, the Court explained, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Id*. at 19;[9] *see also Flamm*, 201 F.3d at 149 ("[I]n a suit by a private plaintiff involving a matter of public concern, we hold that allegedly defamatory statements must be provably false, and the plaintiff must bear the burden of proving falsity, at least in cases where the statements were directed towards a public audience with an interest in that concern."). Whether a statement implies a provably false assertion of fact is a question of law. *Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014) ("Determining whether a statement is an allegation of fact or mere opinion is a legal question for the court.").

---

[9] Some courts have also extended *Milkovich*'s holding to cases where the statements in question are on matters of *private* rather than public concern. *See, e.g.*, *Mink v. Knox*, 613 F.3d 995, 1006–07 (10th Cir. 2010) (discussing the First and Tenth Circuits' application of *Milkovich*'s analysis of First Amendment protections for hyperbolic statements to cases involving speech on matters of private concern). But the parties have not addressed this issue and I need not do so here, since I have found that the statements in question were on matters of public concern.

A statement is not provable as false if it "could not reasonably have been interpreted as stating actual facts." *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50 (1988). Statements of "loose, figurative, or hyperbolic language," "imaginative expression," and "rhetorical hyperbole" are not capable of being proved false. *Milkovich*, 497 U.S. at 20–22. Only a statement that is "objectively verifiable" or "susceptible of being proved true or false" is actionable. *Id.* at 21–22. "[T]he inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the perspective of an ordinary reader of the statement." *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985) (quotation marks omitted).

A court may also consider whether the "general tenor of the [publication] negate[s] th[e] impression" that the challenged statements were intended as statements of fact. *Milkovich*, 497 U.S. at 21. "In other words, in determining whether a statement is capable of being proven false, it is paramount that courts look not just at the allegedly defamatory words themselves, but also at the context in which they were stated." *Adelson v. Harris*, 973 F. Supp. 2d 467, 488 (S.D.N.Y. 2013), *aff'd,* 876 F.3d 413 (2d Cir. 2017). In addition,

> In determining whether a statement constitutes constitutionally protected opinion, courts also look to the specific context of the statement. When looking at a statement's specific context, of particular importance is the principle that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment. . . . The rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts."

*Id.* at 490 (internal citations and quotation marks omitted; alterations adopted). Echoing this reasoning, several courts of appeal have held that statements of opinion supported by disclosed facts are protected as a matter of constitutional law, not just state defamation law, although the Second Circuit does not appear to have addressed this issue. *See, e.g.*, *Standing Comm. on*

*Discipline of U.S. Dist. Ct. for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) ("[W]here a publication sets forth the facts underlying its statement of opinion . . . and those facts are true, the Constitution protects that opinion from liability for defamation. . . . Yagman's Daily Journal remark is protected by the First Amendment as an expression of opinion based on stated facts. . . . Readers were 'free to form another, perhaps contradictory opinion from the same facts,' . . . as no doubt they did." (internal citations omitted)); *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 853 (10th Cir. 1999) ("[S]tatements have been found to be protected by the First Amendment because their underlying factual premises have been fully disclosed."); *McKee v. Cosby*, 874 F.3d 54, 61 (1st Cir. 2017) ("[W]hen the speaker outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." (internal quotation marks omitted)).

I begin by analyzing the affidavits in general and then turn to the specific statements at issue. Here, the First and Second Affidavits were filed in support of the L&S Defendants' objections to motions filed by the Getachews in the State Court Action. ECF No. 357 ¶¶ 16, 29. The Getachews argue that this context weighs in favor of treating the challenged statements as factual because "[a] reader of [sworn affidavits filed in court] would expect them to be truthful, not rhetorical commentary or hyperbole." ECF No. 356 at 41. This point is well-taken but it loses some steam when the context is examined more closely. The portions of the affidavits on which the Getachews' claim is based, including the "eight paragraphs of highly inflammatory material" in the First Affidavit, ECF No. 1 ¶ 30, are expressly couched as a personal aside that does not specifically address the motion before the court. ECF No. 182-3 ¶ 2 ("Before I address the substance of the Motion to Disqualify, I want the Court to know that . . ."); *id.* ¶ 8 ("I set out the

above so the Court knows the true state of horrid affairs, and thus I will now address the Motion to Disqualify as follows."); ECF No. 164-35 ¶ 3 ("Before I address the substance of the Motion, I want the Court to know that . . ."); *id.* ¶ 25 ("I set out the above so the Court knows the true state of the horrid affairs and dealings with the Getachews."). Even "an ordinary reader" of these portions of the affidavits—the only portions on which the Getachhews' claim is based—would understand these statements did not concern "the substance of the motion," ECF No. 164-35 ¶ 3, and were not essential to the issue the Court had to decide.

Furthermore, the affidavits go on to narrate, in detail, the events that transpired between the L&S Defendants and the Getachews, including the lack of rental payments, the actions the Getachews took regarding the property and the pool, and their conduct during the State Court Action. Those factual assertions, which do not appear to be part of the Getachews' abuse of process claim, set forth the factual basis underlying the "highly inflammatory material" that does form the basis of the Getachews' claims. ECF No. 1 ¶ 30. Readers are thus free to determine for themselves whether Rutkowski's belief that he was "fraudulently induced" by the Getachews to enter the lease; that the Getachews "have no intention of paying rent"; that Mr. Getachew "made false statements to intentionally mislead the Court" or that the Getachews "are in violation of the Lease" are fair assessments of the information provided. *See* ECF No. 182-3 ¶¶ 2, 4, 6; ECF No. 164-35 ¶¶ 5–7, 10–14, 19, 21. I find that ordinary readers could only have understood those assertions (and similar statements of opinion) as Rutkowski's personal characterization of the facts set forth in the affidavits, rather than distinct assertions of fact. *See Yagman*, 55 F.3d at 1439–40; *Jefferson Cnty. Sch. Dist.*, 175 F.3d at 853–54; *McKee v. Cosby*, 874 F.3d at 61; *Adelson*, 973 F. Supp. 2d at 490.

Next, I consider each statement from the First and Second Affidavits referenced in the Getachews' complaint, ECF No. 1 ¶¶ 30, 31, 40–41, 45, 50–51, in the order in which it appears in the affidavits.

1. "Before I address the substance of the Motion to Disqualify, I want the Court to know that the Plaintiffs, especially Attorney Mark Getachew, are the singularly least professional, least honest (read dishonest), least moral people I have dealt with in my 40 plus years of professional life - including my extensive time as an Executive of Public Corporations. " ECF No. 182-3 ¶ 2 (emphasis omitted); *see also* ECF No. 164-35 ¶ 3 (substantially the same).

This statement, which was quoted in part in the Post article, asserts non-provable statements of opinion. Whether the Getachews are the least professional, least honest, or least moral people Rutkowski has dealt with in his over forty-year career is unverifiable. The statement cannot fairly be characterized as anything but loose hyperbole. *See Adelson*, 973 F. Supp. 2d at 492 ("[A]n accusation that one has acted immorally is generally a matter of opinion."); *Varughese v. Mount Sinai Med. Ctr.*, 2015 WL 1499618, at *74 (S.D.N.Y. Mar. 27, 2015), *aff'd,* 693 F. App'x 41 (2d Cir. 2017) ("What Varughese objects to are the characterizations of her work as 'unsatisfactory' 'unprofessional' and 'substandard.' But these are matters of opinion, not actionable assertions of fact."); *Mills v. Unisource Worldwide, Inc.*, 2005 WL 578167, at *5 (W.D.N.Y. Mar. 9, 2005) ("[T]he portion of the statement characterizing plaintiff's actions as 'dishonesty and theft' is an opinion."). That is the way the Getachews understood the statement at the time, as their filings in the State Court Action specifically referred to the language used by Defendants as "hyperbole." ECF No. 358 ¶ 38; ECF No. 164-23 at 1 (discussing "the extraneous materials and hyperbole" in Defendants' filing).

2. "While normally I would give someone the benefit of the doubt, Attorney Getachew did not qualify the statements in his sworn Affidavit - - and I assume he understands the oath - - so it is clear he made false statements to intentionally mislead the Court. I believe that *after the Court reads our papers*, the Court will conclude that Attorney

> Getachew, a 20-year attorney with Willkie Farr & Gallagher LLP, made false statements under oath to mislead this Court." ECF No. 182-3 ¶ 2 (emphasis added).

This is a statement of opinion that rests on disclosed facts. The opinion that "[Mr. Getachew] made false statements to intentionally mislead the Court" is explicitly based on the disclosed fact that he "did not qualify the statements in his sworn Affidavit" and Rutkowski's "assum[ption that] he understands the oath" because he is an "Attorney." *See Yagman*, 55 F.3d at 1440; *Jefferson Cnty. Sch. Dist.*, 175 F.3d at 853; *McKee v. Cosby*, 874 F.3d at 61; *Adelson*, 973 F. Supp. 2d at 490. The remainder of the statement is Rutkowski's own belief, or prediction, about what the Court will conclude after it reads the parties' papers, and is therefore not provable as false.

> 3. "The Getachews are the worst type of tenants one can imagine. While they appear to be professional, they are similar to the type of rich entitled people who have taken over houses in the Hamptons, supposedly to escape the Covid epidemic, and have taken advantage of the no-eviction moratorium in NY enacted by Governor Cuomo and now here, the moratorium in Connecticut enacted by Governor Lamont." ECF No. 182-3 ¶ 3 & n.1–2 (citing Daily Mail and New York Post articles titled "Wealthy tenants are SQUATTING in multi-million dollar homes in the Hamptons and refusing to pay rent after NY issued a non-eviction order due to the coronavirus crisis" and "Non-eviction order leads to squatting in style in the Hamptons" and including hyperlinks to both); *see also* ECF No. 164-35 ¶ 4 (substantially the same).

This statement, which is quoted in the Post article, is also incapable of being proved false. Whether the Getachews are the "worst type of tenants one can imagine" depends on the reader's imagination, not any objectively verifiable facts. *See Milkovich*, 497 U.S. at 20–21 (statements of "loose, figurative, or hyperbolic language," "imaginative expression," and "rhetorical hyperbole" are not capable of being proven false); *Chau v. Lewis*, 935 F. Supp. 2d 644, 661 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) (finding that "'worst of the worst'. . . is a non-actionable pure opinion"); *Shanahan v. Town of Huntington*, 750 F. Supp. 3d 7, 13 (E.D.N.Y. 2024) ("The words 'worst' and 'ridiculous' are largely subjective.").

Further, the statement that the Getachews "are similar to the type of rich entitled people" who are taking advantage of eviction moratoriums cannot reasonably be interpreted as stating actual facts about the Getachews. The comparison evoked by the word "similar" is too "debatable" and "loose" to be susceptible of being proved false, and even whether the Getachews are "rich" or "entitled" or "have taken advantage of the no-eviction moratorium" is not objectively verifiable because the terms are subjective. *Adelson*, 973 F. Supp. 2d at 493. "And like most metaphors," the meaning of the comparison "is imprecise." *Id.* at 491. Further, the inclusion of two footnotes providing hyperlinks to articles about "squatters" in the Hamptons invites readers to analyze for themselves the comparison between the Getachews and the "rich entitled people who have taken over houses in the Hamptons . . . and have taken advantage of the no-eviction moratorium." *See Ganske v. Mensch*, 480 F. Supp. 3d 542, 554 (S.D.N.Y. 2020) ("The inclusion of the hyperlink is particularly significant. Several courts have determined that the inclusion of a hyperlink to a report or article in a communication shared on an Internet forum is a sufficient means of disclosing a factual basis on which an opinion rests."); *Adelson*, 973 F. Supp. 2d at 485 ("[T]he hyperlink connects one to the source of the [statement]'s claims").

4. "On June 5, 2020, the Getachews signed a Lease and Rider and took possession of my $2.2 Million (approx. 8,000 square foot house) in Greenwich, in a safe gated community with acreage, a pool and a spa. Other than June 2020 rent, which was required to be wired on June 5 in order to permit possession, they have not paid any rent since - - not for July, August, September and/or October, 2020. Based on their actions to date, it is clear that they have no intention of paying rent - now or in the future because they know Governor Lamont keeps extending the 'no-eviction' moratorium, and for now, I cannot serve a Notice to Quit until January 2021." ECF No. 182-3 ¶ 4.

The statement that the Getachews "have no intention of paying rent . . . because they know Governor Lamont keeps extending the 'no-eviction' moratorium," which is quoted in the Post article, is an opinion "[b]ased on [the Getachews'] actions to date," i.e., the disclosed fact that the Getachews had not made any rental payments since moving into the house; the opinion is also

based on the fact disclosed in the prior paragraph that Connecticut's Governor Lamont had adopted an eviction moratorium. *See Adelson*, 973 F. Supp. 2d at 490. Because an ordinary reader would understand that Rutkowski had no ability to peer into the Getachews' minds and thereby discern their "intention" or what "they kn[e]w," such a reader would interpret this statement as an opinion not subject to objective verification. *See Cassidy v. Lawson*, 2005 WL 2508593, at *5 (D. Conn. Sept. 29, 2005) ("Ciesielski's statement expresses his opinion about Mastrianni's motivations in distributing a flyer . . . . As Mastrianni's intention is not an objectively provable fact, Ciesielski's statement may be a protected expression of pure opinion.").

The Getachews contend that this statement "implies undisclosed defamatory facts" and "omits critical context that Plaintiffs had a justifiable reason for offsetting rent." ECF No. 356 at 44–45. But the statement does not imply that there are any undisclosed facts supporting Rutkowski's opinion that the Getachews "have no intention of paying rent." The affidavit details that the Getachews did not pay any rent since they moved into the house and does not hint at the existence of any facts not set forth in the affidavit. An ordinary reader would believe that a landlord would hold the opinion that tenants who have not paid rent for three months after moving in do not intend to pay rent in the future. ECF No. 182-3 ¶¶ 5–8. Further, a later portion of the same affidavit does disclose the Getachews' position regarding repairs. *Id.* ¶¶ 24, 26 (quoting from Mr. Getachew's affidavit statements regarding "repairs"); *id.* ¶¶ 25–26 (quoting from lease and rider agreements regarding "condition of premises," repairs, and merger clauses); *id.* ¶ 27 (quoting from Mr. Getachew's affidavit regarding the condition of the pool); *id.* ¶ 32 ("Starting at Paragraph 21 and continuing through 27 of Attorney Getachew's Affidavit, Attorney Getachew gives his rendition of his dealings directly with me over alleged issues with the premises."). The First Affidavit's repeated references to Mr. Getachew's affidavit, its attachment of the lease, *id.* at 25–

30, and its acknowledgement that Mr. Getachew has his own "rendition of his dealings directly with me over the alleged issues with the premises," *id.* ¶ 32, all direct the reader to consider the governing agreement between the parties and the Getachews' position on the parties' disputes, making it even more likely that an ordinary reader would view the challenged statements in the First Affidavit as opinions. *See McKee*, 874 F.3d at 61 ("[W]hen the speaker outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." (internal quotation marks omitted)). The Getachews cite no authority to support the notion that Rutkowski was required to set forth every exculpatory fact that could paint the Getachews in a more positive light before expressing a negative opinion about them based on disclosed facts. And despite contending that "[t]he facts upon which Rutkowski comments are patently false . . ." ECF No. 356 at 44, it is undisputed that the Getachews moved in during June 2020 and did not pay rent for the months of July, August, September, and October of 2020, whatever their arguments about repair costs and setoffs might have been. ECF No. 358 ¶¶ 11, 16, 22, 28, 35.

5. "Moreover, without my consent, the Getachews have performed multiple alterations and have caused significant damage to my house and have run up huge bills in my name (all in violation of the lease). As the Court probably can tell from the Getachews' papers, the condition of the pool is at issue between the two of us. My pool contractor, Eric Valdez of Skyblue Pools, who has been maintaining the pool for years, opened the pool for the Getachews in early June, 2020. Eric Valdez reported to me that he had opened the pool for the Getachews in June 2020 and it was operating fine off the main drain (e.g., the equipment, pumps, heaters were all working). However, the seals for the valve heads for the skimmers were leaking and needed to be replaced. Even with the leaking seals on the valves, the pool was functioning. He had found that some valves had become frozen/cracked over the winter. It happens from time to time. Mr. Valdez reported to me that it was somewhere between $2,000-$3,000 to fix. That was my responsibility and I had indicated to the Getachews that I was taking responsibility to repair/fix this specific issue.

> Incredibly, Mr. Getachew, without any authority nor my consent, unjustly fired Mr. Valdez. As a result, Mr. Getachew hired another contractor, who suggested repairs of more than double of the estimate from Mr. Valdez. As such, I requested that we needed to obtain another independent quote from Putnam Pools. Mr. Getachew declined and then proceeded to run up a $45,000 bill, basically digging up all of the piping around the pool and associated parts of the pool and replacing them. Again, this was without my authority and consent. This has become a nightmare for me." ECF No. 182-3 ¶ 5 (emphasis omitted).

The statement that "without my consent, the Getachews have performed multiple alterations and have caused significant damage to my house and have run up huge bills in my name (all in violation of the lease)," which is also quoted in the Post article, is based on the detailed narrative that follows, which discloses the facts supporting the opinions that the Getachews breached the lease, caused alterations and damage to the house, and amassed huge bills in Rutkowski's name, all "without [his] authority and consent." *Adelson*, 973 F. Supp. 2d at 490. The hyperbolic statement that "[t]his has become a nightmare for me" is an assertion of Rutkowski's own experience and is incapable of being proved false. *See Gill v. Giuliani,* 2024 WL 4858992, at *4 (S.D.N.Y. Nov. 21, 2024) ("A person's subjective experience of pain, while it may be real, is typically understood as describing that person's reaction and therefore is not actionable.").

> 6. "Additionally, the Getachews are in violation of the Lease for planting a garden directly on top of several sections of flat roof on the second floor of my home, thereby impeding the drainage flow as they were intended. Furthermore, it is my understanding that he had drilled screws through wood siding and installed board to hold in the dirt by installing directly into the copper sheeting into the roof. This creates great structural and water integrity issues and violating the existing warranty for the roof." ECF No. 182-3 ¶ 6.

Rutkowski's statement that "the Getachews are in violation of the Lease" – a copy of which is attached to the affidavit, ECF No. 164-20 at 25–30 – is, to the ordinary reader, his opinion based on the disclosed facts immediately following that statement. *See Moore*, 2022 WL 2525722, at *3; *Adelson*, 973 F. Supp. 2d at 490; *Yagman*, 55 F.3d at 1440; *Jefferson Cnty. Sch. Dist.*, 175 F.3d at 853; *McKee v. Cosby*, 874 F.3d at 61; *Adelson*, 973 F. Supp. 2d at 490.

7. "The list of breaches is exhausting. Mr. Getachew had my movers/contractors take bags of his trash along with numerous planters of dead plants/filled with dirt and instructed them to be delivered to a garage at my condo in Greenwich - all at my expense, along with items at the house which were not to be moved but . . . which he decided unilaterally he did not want on the property. Again, Mr. Getachew insisted these items to be removed without any discussion nor my consent - - the homeowner. The house is mine not his, but he knows that under the present state of things, I am . . . powerless to evict him. On more than one occasion, I was denied access to see various areas of the home once the Getachews took possession. In early August, after the near hurricane storms impacted power lines and trees in the area, I requested to inspect the outside property - only to be informed by the Getachews that my outside visit would be construed as an invasion of their privacy during Covid and a potential legal violation." ECF No. 182-3 ¶ 7.

The statement that "[t]he list of breaches is exhausting" expresses an opinion about Rutkowski's own experience (of exhaustion) that is incapable of being proved false, *Gill*, 2024 WL 4858992, at *4, as well as an opinion that the Getachews had breached the lease, which is based on the disclosed facts immediately following that statement.

8. "Given the initial issues with these Tenants, within a month of the contract, I had offered the Getachews the right to terminate the lease (without prejudice nor any penalties). Per our email of July 3rd, 2020: 'Per your most recent text/emails, it is clear that you and your family are not happy of your decision to rent our home. Per our discussion, I prefer to have phone conversations and keep communications open (e.g., my earlier calls to you). It might be best that we work out an amicable, mutually acceptable date to release and transition from the lease contract. Please call me to discuss . . .' I have made this offer on a number of occasions. I set out the above so the Court knows the true state of horrid affairs, and thus I will now address the Motion to Disqualify as follows." ECF No. 182-3 ¶ 8 (emphasis omitted).

The statement that "[Rutkowski] set out the [preceding paragraphs in the First Affidavit] so the Court knows the true state of horrid affairs" is a statement of his own subjective motivation, and is incapable of objective verification. *See Cassidy*, 2005 WL 2508593, at *5 ("As Mastrianni's intention is not an objectively provable fact, Ciesielski's statement may be a protected expression of pure opinion."). The statement regarding "the true state of horrid affairs" is an unverifiable characterization, and one that is also based on the disclosed facts preceding the statement in this paragraph and those prior.

I turn next to the Second Affidavit, and more precisely, the portions of that affidavit mentioned in the Getachews' Complaint that I have not already analyzed above. The Second Affidavit, which was filed months after the Post article, repeated many of the same hyperbolic insults and rhetoric from the First Affidavit. The complaint also alleges that Rutkowski called the Getachews "nasty and devious people." ECF No. 1 ¶ 51. That statement appears in the following paragraph.

1. "Plaintiffs are bringing this case not based on anything meritorious, but are part of a vendetta and bully tactics that Mark Getachew attempted to use, to first fraudulently induce L&S to enter into a lease which gave him and his family use of a beautiful house with an amazing pool and out door facilities in the middle of the pandemic, and then to create so much havoc for the Landlord that it would capitulate and allow him and his family to stay rent free. One of the prime examples of this is a text message he sent to a third party, which he did not produce in discovery, dated July 2, 2020, less than a month into the lease (which commenced June 5, 2020) where his deceitful tactics were on display, as he wrote, 'I am going to rake Larry over the coals.' (Ex. A) Again, this was less than a month into the lease. The Getachews then served this lawsuit on August 21, 2020, a mere ten weeks into the Lease. While the Getachews claimed they were 'fraudulently induced' into entering into the Lease, . . . they sta[y]ed in the house [and] used the Pool and the amazing grounds for another year, until the pool season ended on August 31, 2021. On August 31, 2021, the Getachews then packed up and left L&S on the hook for all of the carrying costs for the next nine months and with a lost opportunity of selling the house at the height of the Pandemic, and without the Getachews paying rent for September 2020-May 2021. That tells you what nasty and devious people they are." ECF No. 164-35 ¶ 5.

The assertion that the Getachews are "nasty and devious people," introduced by the phrase "[t]hat tells you," is expressly based on the factual assertions that precede it—specifically, a text message Mr. Getachew sent, which the affidavit attached as an exhibit, the dates the Getachews stayed at the property and did not pay rent, and the date they moved out of the property. Further, such loose, hyperbolic name-calling is not provable as false. *See Conti v. Doe,* 535 F. Supp. 3d 257, 270 n.9 (S.D.N.Y. 2021) ("[R]hetorical hyperbole, vulgar name-calling, and generalized insults are not, without more, actionable under the defamation laws"); *Patel v. Patel*, 2024 WL 37094, at *4

(S.D.N.Y. Jan. 3, 2024) (statements characterized as "sexually charged name calling . . . are not provable statements of fact, and thus plainly not actionable as a matter of law."); *Adelson v. Harris,* 774 F.3d 803, 807 (2d Cir. 2014) ("[C]haracterization of Adelson's money as 'dirty' and 'tainted' is the sort of rhetorical hyperbole and unfalsifiable opinion protected by the First Amendment.").

> 2. "The Getachews fraudulently induced L&S into entering into the Lease, used the premises to get them through two pool seasons and then simply walked out and, using their abilities as attorneys, and the resources of Wilke Farr & Gallagher and Shipman & Goodwin, have employed 'Stalingrad Tactics' to attempt to beat L&S and me into submission. It will not happen." ECF No. 164-35 ¶ 10.

The statement that the Getachews have used their legal skills and the resources of law firms to employ "'Stalingrad Tactics' to attempt to beat L&S and me into submission" is rhetorical hyperbole and is incapable of being proved true or false. *Cummins v. SunTrust Cap. Markets, Inc.*, 416 F. App'x 101, 103–04 (2d Cir. 2011) ("[C]haracterizations . . . as . . . self-interested, abusive, unethical, unjustifiable, a manipulation . . . were non-actionable. . . [because they] constitute subjective, non-verifiable opinions. . . . [T]he negative implications of these characterizations . . . do not transform the characterizations from expressions of opinion into statements of fact."); *Adelson*, 774 F.3d at 807 ("[C]haracterization of Adelson's money as 'dirty' and 'tainted' is the sort of rhetorical hyperbole and unfalsifiable opinion protected by the First Amendment."). And like the statements that the Getachews were "nasty and devious" and "have no intention of paying rent," the statement that the Getachews "fraudulently induced L&S into entering the Lease" can only reasonably be interpreted as an opinion based on disclosed facts, as previously discussed.

> 3. "Mr. Getachew testified at the very first hearing in this case, at the Motion to Disqualify, that he was told by Eric Valdez, who was opening and servicing the pool in June 2020, that the pool was 'inoperable.' Placing aside that Mr. Valdez denies making this statement because the pool was operable, I recall Judge Spader asking Mr. Getachew in sum and substance, that if the day after he moved in and was told, according to Mr. Getachew that the pool was 'inoperable' why did he stay - - why did not leave if the pool was so important. Mr. Getachew could not or would not articulate

> a reason because the reason shows him to be a fraudster. Mr. Getachew wanted a house with a pool where he could squat during the Moratorium and not pay rent." ECF No. 164-35 ¶ 15.

The statements that "Mr. Getachew . . . [is] a fraudster," and he "wanted a house with a pool where he could squat during the Moratorium and not pay rent" are based on disclosed facts—his testimony at a hearing in the State Court Action and the earlier-recited facts about his not paying rent—and are therefore opinions. *See Adelson*, 973 F. Supp. 2d at 490; *Yagman*, 55 F.3d at 1440; *Jefferson Cnty. Sch. Dist.*, 175 F.3d at 853; *McKee v. Cosby*, 874 F.3d at 61.

### B. The Litigation Privilege Protects the Statements in the Affidavits

Even if the First Amendment did not apply, I would find that the litigation privilege immunizes the statements in the First and Second Affidavits.

#### i. The Connecticut Appellate Court's Decision in *Khan v. Jewish Women International* Is An Intervening Change in Law

Citing a recent ruling of the Connecticut Appellate Court, the Defendants request that I revisit earlier rulings by me and Judge Hall that the litigation privilege does not apply to properly alleged abuse of process claims. ECF Nos. 340-1 at 34 n.9; 360 at 13–14; 361 at 6–9; *see Getachew*, 2026 WL 851408 at *11. The law of the case doctrine is "discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment. . . . The major grounds justifying reconsideration [include] an intervening change of controlling law." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011) ("The law of the case does not withstand an intervening change of controlling law." (internal quotation marks omitted)).

When this case was assigned to Judge Hall, she denied the Defendants' motions to dismiss, rejecting their argument that their conduct was shielded by the litigation privilege, which protects

communications made in the course of litigation. ECF No. 48. Judge Hall found that the litigation privilege does not apply to properly alleged abuse of process claims. *Id.* at 7. In their first motions for summary judgment, the Defendants again argued that the litigation privilege barred the Getachews' abuse of process claim, ECF Nos. 155-1 at 41–43; 164-1 at 29, but I found that the Defendants did not offer "cogent or compelling reasons to revisit Judge Hall's ruling on this subject" and I declined to do so. *Getachew*, 2026 WL 851408, at *11 ("The cases the defendants cite for the proposition that recent rulings permit the application of the litigation privilege to abuse of process cases still recognize that the litigation privilege does not apply to abuse of process claims where that claim is sufficiently alleged.").

After my first summary judgment ruling, the Connecticut Appellate Court[10] issued a ruling in which it applied the litigation privilege to an abuse of process claim alleging that non-profit organizations falsely called the plaintiff a "rapist" in a proposed amicus brief filed in the Connecticut Supreme Court. *Khan v. Jewish Women Int'l*, 240 Conn. App. 76 (2026). The plaintiff, who had previously been acquitted of a sexual assault allegation, claimed that the would-be amicus filers' "primary purpose in attempting to file the [proposed] amicus brief was . . . [t]o smear the plaintiff . . . [t]o harm the plaintiff's reputation . . . [t]o serve as an adversary in the litigation against the plaintiff . . . to discourage the plaintiff from maintaining [the underlying] lawsuit; and . . . [t]o raise funds . . . ." *Khan v. Jewish Women Int'l*, 240 Conn. App. at 101. The Appellate Court found that the abuse of process claim "[was] based entirely on the assertion that the

[10] Because the Court is sitting in diversity, Connecticut state law on the litigation privilege applies. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938). "Where there is no controlling case law from the state's highest court, a federal court sitting in diversity must predict how the highest court would resolve the issue." *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 176 n.27 (D. Conn. 2002) (citing *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir. 1997)).

defendants' choice of words in the proposed amicus brief caused the plaintiff harm incidental to the litigation.":

> [T]he only harm that the plaintiff alleges he suffered is that caused by the fact that the defendants labeled him a rapist in the brief. There is no allegation that the defendants took any action outside the normal course of the amicus process or that they sought any relief other than to urge the Supreme Court [to rule against the plaintiff on the legal issue in the appeal].

*Id.* Citing language from a Connecticut Supreme Court decision that the litigation privilege protects "participation and candor in judicial proceedings . . . regardless of the particular tort alleged in response to the words used during participation in the judicial process" and "the nature of the theory [on which the challenge is based] is irrelevant" "because the [litigation] privilege protects the communication," *id.* at 99 (quoting *MacDermid, Inc. v. Leonetti*, 310 Conn. 616, 628 (2013)), the Appellate Court held that "the label a party attaches to a cause of action does not control whether it is barred by the litigation privilege." *Id.* at 98–99.

Although my invitation to the parties to file a second round of summary judgment motions was based on the First Amendment, the parties have now fully briefed the impact of the *Khan* decision on the earlier rulings in this case, and I find that the decision warrants altering the portion of those rulings finding the litigation privilege inapplicable. The *Khan* case closely tracks the factual circumstances of this one: Like Mr. Khan, the Getachews allege harm to their reputations from the words used in the First and Second Affidavits rather than from any procedural step the defendants took outside the normal course of litigation. Further, because the *Khan* decision is well-reasoned and consistent with recent Connecticut Supreme Court case law,[11] I predict that the Connecticut Supreme Court would follow it.

---

[11] "This court consistently has held that communications made during and relevant to a judicial proceeding are afforded immunity . . . It is well established that the privilege extends to pleadings and other papers made a part of a judicial or quasi-judicial proceeding . . . .This is true even if the communications are false, extreme, outrageous, or malicious. To the extent the plaintiff's claim is premised on false

The Getachews' argument that *Khan* does not affect this case is unpersuasive. The Getachews are correct that *Khan* reiterated the rule that "well pleaded claims of . . . abuse of process are not barred by the litigation privilege." *Id.* at 98. And they correctly point out that Judge Hall found that their abuse of process claim was adequately pled and that I adopted that conclusion. They also correctly point out that I previously found that the record, "when construed in the light most favorable to the Getachews, suggests that the First Affidavit was submitted primarily for an improper purpose, i.e., to besmirch the Getachews' reputations in the media, rather than to oppose the motion for disqualification." *Getachew*, 2026 WL 851408 at *9. The problem is that the Appellate Court applied the rule about "well pleaded abuse of process" claims differently from the way Judge Hall and I did. Faced with very similar factual allegations – that "the defendants' primary purpose in attempting to file [the proposed] amicus brief was . . . to smear the plaintiff . . . [t]o harm the plaintiff's reputation," 240 Conn. App. at 101 – the *Khan* Court found those allegations "insufficient to state an abuse of process claim" because they were "based entirely on the assertion that the defendants' choice of words in the proposed amicus brief caused the plaintiff harm incidental to the litigation." *Id.* The *Khan* decision suggests that the Getachews did not adequately plead their abuse of process claim because the improper purpose alleged was to harm their reputations and the means used was the "defendants' choice of words" in documents filed in court. The intervening change of law here undermines my and Judge Hall's earlier rulings in this case that the abuse of process claim was "well pled."

Given the factual similarity between the two cases, it is difficult to see why the *Khan* ruling should not govern this case. True, as the Getachews point out, *Khan* did not involve evidence of a

---

statements contained in pleadings and documents related to the litigation—such as the allegedly false statements contained in the defendant's answer, special defense, and discovery responses—the privilege clearly applies." *Dorfman v. Smith*, 342 Conn. 582, 601–02 (2022) (internal citations, quotation marks omitted; alterations adopted)).

"scheme" like the one involving Grayson and Rutkowski that led up to the publication of the Post article, "including [Grayson's] threat to [the Getachews' prior counsel to tarnish the Getachews in the media], loading up the First Affidavit with inflammatory language, [and] communicating with and sending photos to the New York Post." ECF No. 356 at 39-40 n. 14. But if the purpose of the litigation privilege is to "protect . . . participation and candor in judicial proceedings . . . regardless of the particular tort alleged *in response to the words used* during participation in the judicial process," i.e., if "the privilege protects the *communication*," *MacDermid, Inc.*, 310 Conn. at 628 (first emphasis added), then in a case where the alleged harm stems from "the words used," why should the motivations and maneuverings behind the use of those words matter? Subsequent discussion in *Khan* confirms that they do not.

After disposing of the abuse of process claim, the *Khan* court found that the litigation privilege barred the portion of the plaintiff's claims alleging that the defendants had republished the proposed amicus brief "on their website and to donors." 240 Conn. App. at 81. For this part of its ruling, the *Khan* court relied on the Connecticut Supreme Court's decision in *Kelley v. Bonney*, 221 Conn. 549 (1992), in which a teacher sued members of a local board of education for defamation and intentional infliction of emotional distress on account of a complaint the board members had filed against him with the state department of education; one of the board members had also provided a copy of the complaint to a local newspaper. The Connecticut Supreme Court found that the board members were immune from liability under the litigation privilege, including for the conduct of the board member providing the complaint to the media. Noting that the media was entitled to access the complaint filed with state department of education under Connecticut's Freedom of Information Act, the court held: "[p]ublication to the media of material that the media was independently entitled to view . . . cannot provide a basis for a claim of defamation," 221

Conn. at 576; the litigation privilege applied, the court found, because "[w]e are aware of no persuasive justification for punishing [the school board member] for publication to [the newspaper] of the . . . complaint if [the newspaper] was independently permitted to view the material." *Id.* at 577. Invoking this language, the *Khan* court found that the republication of the proposed amicus brief, including the accusation that the plaintiff was a "rapist," was similarly protected by the litigation privilege. The court also rejected the plaintiff's arguments that it should not apply *Kelly* on the ground that in *Kelly*, the newspaper had requested a copy of the complaint, whereas the nonprofit organizations had unilaterally republished their proposed amicus brief on their websites: "Nothing in *Kelley* . . . suggests that the court's decision turned on the fact that the [newspaper] had requested a copy of the complaint." 240 Conn. App. at 107. Applied here, this reasoning suggests that it does not matter if Grayson and Rutkowski steered the Post reporter to Rutkowski's inflammatory words in an effort to have them widely published; the Defendants are still protected from liability for damages stemming from their use of those words in a court filing.

All of this leads me to conclude that both the statements in the First and Second Affidavits and Grayson's and Rutkowski's conduct in drawing the Post's attention to them are protected by the litigation privilege. I do not see how a different conclusion could follow from *Khan* and *Kelley*.

I still need to determine, however, whether the statements challenged by the Getachews satisfy the "pertinence" requirement of the litigation privilege.

**ii. The Challenged Statements in the Affidavits Were "Pertinent" to the State Court Action**

In Connecticut, "communications uttered or published in the course of judicial proceedings are absolutely privileged as long as they are in some way pertinent to the subject of the controversy." *Gallo v. Barile*, 284 Conn. 459, 466 (2007) (alterations adopted). The privilege applies "as long as the statements relate sufficiently to issues involved in . . . [the] judicial

proceeding," and the "test for relevancy" is "generous." *Dorfman v. Smith*, 342 Conn. 582, 601 (2022); *see also Bruno v. Travelers Cos.*, 172 Conn. App. 717, 727 (2017) ("[O]ur law provides for a very generous test for relevance."). "This is true even if the communications are false, extreme, outrageous, or malicious." *Id.* at 601–02. "[A] statement is sufficiently pertinent to fall within the privilege . . . as long as the statement has some reference to the subject matter of the proposed or pending litigation, although it need not be strictly relevant to any issue involved in it." *Khan*, 240 Conn. App. at 94 (internal quotation marks omitted).

Here, although the challenged statements in the First Affidavit were not germane to the issue before the court, i.e., they did not discuss any facts that would help the court decide the motion to disqualify, they were pertinent to the Getachews' landlord-tenant dispute with the L&S Defendants in the "generous" sense described in the case law because they were related to "the subject of the controversy." The First Affidavit discusses the landlord-tenant dispute at length and articulates the challenged statements as context for Rutkowski's argument opposing the Getachews' motion to disqualify Grayson. *See* ECF No. 182-3 ¶ 2 ("Before I address the substance of the Motion to Disqualify, I want the Court to know that . . ."); *id.* ¶ 3 ("The Getachews are the worst type of tenants one can imagine. . ."); *id.* ¶ 4 ("On June 5, 2020, the Getachews signed a Lease and Rider and took possession of my $2.2 Million (approx. 8,000 square foot house) in Greenwich . . . they have not paid any rent since . . ."); *id.* ¶ 5 ("Moreover, without my consent, the Getachews have performed multiple alterations and have caused significant damage to my house and have run up huge bills in my name (all in violation of the lease). As the Court probably can tell from the Getachews' papers, the condition of the pool is at issue between the two of us. . ."); *id.* ¶ 6 ("Additionally, the Getachews are in violation of the Lease . . ."); *id.* ¶ 7 ("The list of breaches is exhausting . . ."); *id.* ¶ 8 ("Given the initial issues with these Tenants, within a month

of the contract, I had offered the Getachews the right to terminate the lease . . . I set out the above so the Court knows the true state of horrid affairs, and thus I will now address the Motion to Disqualify as follows. . ."); *id.* ¶ 13 ("It would constitute a great loss, prejudice and hardship for me to start working with a new attorney and develop a new relationship, especially since this is clearly a tactical move by Attorney Getachew who I find, and given my experience in dealing with corporate America, to be of the lowest ethical and professional standards I have ever encountered."). Accordingly, the statements within the First Affidavit clear the low bar of "pertinence" and are protected by the litigation privilege.

The statements within the Second Affidavit are likewise pertinent to the Getachews' landlord-tenant dispute with the L&S Defendants. The Second Affidavit repeats much of the discussion of the landlord-tenant dispute in the First Affidavit and provides those statements as context for Rutkowski's argument opposing the Getachews' motion for partial summary judgment. ECF No. 164-135 ¶ 1 ("I submit this Affidavit in opposition to Plaintiffs' Motion for Partial Summary Judgment."); *id.* ¶ 2 ("I have an understanding of commercial transactions and contracts, such as a lease which is involved here, and also fraudulent and deceptive practices, such as those practiced and perpetrated by the Getachews here."); *id.* ¶ 3 ("Before I address the substance of the Motion, I want the Court to know that the Plaintiffs, especially Attorney Mark Getachew, are the singularly least professional, least honest (read dishonest), least moral people I have dealt with in L&S's 40 plus years of professional life . . ."); *id.* ¶ 4 ("The Getachews were the worst type of tenants one can imagine."); *id.* ¶ 5 ("Plaintiffs are bringing this case not based on anything meritorious, but are part of a vendetta and bully tactics that Mark Getachew attempted to use, to first fraudulently induce L&S to enter into a lease which gave him and his family use of a beautiful house with an amazing pool and out door facilities in the middle of the pandemic . . . . The

Getachews then served this lawsuit on August 21, 2020, a mere ten weeks into the Lease. While the Getachews claimed they were 'fraudulently induced' into entering into the Lease, . . . they sta[y]ed in the house used the Pool and the amazing grounds for another year . . . . That tells you what nasty and devious people they are."); *id.* ¶ 10 ("The Getachews fraudulently induced L&S into entering into the Lease, used the premises to get them through two pool seasons and then simply walked out and, using their abilities as attorneys, and the resources of Wilke Farr & Gallagher and Shipman & Goodwin, have employed 'Stalingrad Tactics' to attempt to beat L&S and me into submission."); *id.* ¶ 18 ("As the Court probably can tell from the Getachews' papers, the condition of the pool is Plaintiff's main if not only issue . . . Mr. Getachew . . . proceeded to run up a $45,000 bill, basically digging up all of the piping and associated parts of the pool and replacing them. . . . Again, this was without L&S's authority and consent. . . This became a nightmare for L&S."); *id.* ¶ 19; *id.* ¶ 22 ("The list of breaches is exhausting."); *id.* ¶ 25 ("I set out the above so the Court knows the true state of the horrid affairs and dealings with the Getachews."); *id.* ¶ 30 ("In closing I respectfully request that the Motion for Partial Summary Judgment be denied."). Accordingly, the statements within the Second Affidavit are also "pertinent" and protected by the litigation privilege.

* * *

Nothing in this ruling is meant to suggest that the filing of affidavits laden with personal insults is "okay" or that a court is powerless to curb this behavior. In fact, in the State Court Action, the judge "admonished the parties" for making their dispute "highly personal – excessively so," and, when discussing the Second Affidavit, noted: "The task of discerning facts is made unnecessarily more complicated by the personal attacks on the plaintiffs . . . . Paragraphs 3 and 4 of the affidavit are somewhat counterproductive insofar as they express a highly inappropriate

animus." *Getachew v. L&S Investments, LLC*, 2022 WL 2133577 *1, 3-4 (Conn. Super. Ct. J.D. Stamford/Norwalk June 14, 2022). Had it found it warranted, the court could have gone further, given that Rutkowski's insults were repeated and embellished in several filings in the litigation. *See* Conn. P.B. § 1-25 ("[T]he judicial authority, solely on its own motion and after a hearing, may impose sanctions for . . . (3) [a]fter prior direction from the court, the filing of any materials or documents that: (A) are not relevant and material to the matter before the court or (B) contain personal, medical or financial information that is not relevant or material to the matter before the court.").[12]

### C. The Litigation Privilege Does Not Protect the PJR Application

As in the First Amendment analysis, however, the PJR Application stands on a different footing. The Getachews do not seek to hold the defendants liable for any "communication," *MacDermid*, 310 Conn. at 628, in the PJR Application. Rather, they assert that the amount sought in the PJR Application was knowingly excessive, meritless, and "another extortionate method concocted by Defendants Rutkowski and Grayson . . . to pressure [the] Getachews into paying money that they did not owe." ECF No. 1 ¶ 47 The Connecticut Supreme Court has distinguished between the conduct involved in bringing suit (or a counterclaim) and the words used in the pleadings: "whether or not a party is liable for vexatious suit in bringing an unfounded and malicious action, he is not liable for the words used in the pleadings and documents used to prosecute the suit. . . . Parties and their counsel who abuse the process by bringing unfounded actions for personal motives are subject to civil liability for vexatious suit or abuse of process." *DeLaurentis v. City of New Haven*, 220 Conn. 225, 264 (1991) (internal quotation marks and

[12] I am unaware of any authority suggesting that a Connecticut court would construe "relevance" and "materiality" as used in this Practice Book provision anywhere near as "generously" as courts construe "relevance" or "pertinence" in the context of the litigation privilege.

citations omitted). Because the abuse of process claim rests on the amount sought rather than "the words used" in the PJR Application, the litigation privilege does not apply.

**D. Further Briefing on the PJR Application**

Because the two affidavits are not actionable under the First Amendment and the litigation privilege, all that is left in the case to support the Getachews' abuse of process claim is the PJR Application. In a footnote in their brief, the L&S Defendants contend that the abuse of process claim cannot be sustained on the PJR Application alone, citing the Connecticut Supreme Court's decision in *Mozzochi v. Beck*, 204 Conn. 490, 497 (1987), which I did not discuss in my first summary judgment ruling. ECF No. 340-1 at 35–36 n.11.[13]

In *Mozzochi*, the court answered "no" to the question of "whether a cause of action for abuse of process may be brought to recover damages from attorneys who allegedly pursued litigation despite their discovery that their client's claim lacked merit." *Id.* at 490. "[A]lthough attorneys have a duty to their clients and to the judicial system not to pursue litigation that is utterly groundless, that duty does not give rise to a third party action for abuse of process unless the third party can point to specific misconduct intended to cause specific injury outside of the normal contemplation of private litigation." *Id.* at 496.

The *Mozzochi* decision raises a question about the treatment of the PJR Application in my first summary judgment ruling. There, I found that, when the facts were construed in the light most favorable to the Getachews, the record supported an inference that Rutkowski and Grayson knew that the amount sought in the PJR Application was grossly excessive. 2026 WL 851408 at *10. I relied on two Connecticut Appellate Court decisions involving the filing of a lien and a prejudgment remedy application, *id.*, but neither decision questions the teaching of *Mozzochi*,

[13] In my first summary judgment ruling, I did not analyze whether the PJR Application, standing alone, could support the Getachews' abuse of process claim. *See Getachew*, 2026 WL 851408, at *6.

which is that the filing of knowingly frivolous allegations is not enough to state a claim for abuse of process when the purpose of doing so is one "ordinarily associated with the pursuit of litigation," including "enrich[ing the filer] at the [opposing party's] expense." 204 Conn. at 494, 497.

It would be unfair to adjudicate this issue without further briefing, however, because my orders permitting the Defendants to file a second round of summary judgment motions contemplated that their motions would be based on "First Amendment issues," not on Connecticut abuse of process law. *See* ECF Nos. 327, 332. I made an exception for the litigation privilege because the parties have fully briefed the impact of the *Khan* decision on this case. But neither Grayson nor the Getachews have briefed the issue whether the PJR Application alone can support the abuse of process claim, and even the Rutkowski Defendants discussed this issue only in a footnote. ECF No. 340-1 at 35-36 n.11.

Especially because the PJR Application does not appear to be associated with any damages, I now think it would be consistent with Rule 1 of the Federal Rules of Civil Procedure to call for further briefing on whether the abuse of process claim in this case should proceed to trial on the PJR Application alone and how I should reconcile *Mozzochi* and any of its progeny with the "excessive attachment" cases cited in my first summary judgment ruling. Accordingly, I will permit limited further briefing on this issue as follows: (1) Grayson and the Rutkowski Defendants may each, on or before November 16, 2026, file a supplemental brief of no more than 12 pages addressing the issues described in this paragraph; (2) the Getachews may on or before December 7, 2026, file a response to both briefs consisting of no more than 15 pages, and (3) Grayson and the Rutkowski Defendants may, on or before December 18, 2026, each file a reply of no more than 3 pages. The parties may not file further evidence and should confine their briefs to the existing record.

## V. Conclusion

For the reasons set forth above, Defendants' Motions for Summary Judgment are GRANTED as to the First and Second Affidavits. I reserve judgment as to the PJR Application.

IT IS SO ORDERED.

/s/

Michael P. Shea, U.S.D.J.

Hartford, Connecticut
November 2, 2026